# FEDERAL TRADE COMMISSION *v.* SUN OIL CO.

No. 56. Argued November 15, 1962.—Decided January 14, 1963.

*Robert B. Hummel* argued the cause for petitioner. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Loevinger, J. William Doolittle, Elliott H. Moyer* and *James McI. Henderson.*

*Leonard J. Emmerglick* argued the cause for respondent. With him on the brief were *Ellis Lyons, George Alexander, Henry A. Frye* and *Richard L. Freeman.*

Briefs of *amici curiae,* urging affirmance, were filed by *Milton Handler* for Texaco Inc. and by *Otis H. Ellis* for National Oil Jobbers Council, Inc.

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

This case grows out of a gasoline "price war" in Jacksonville, Florida. The question presented is whether a refiner-supplier of gasoline charged with the granting of a price discrimination in violation of § 2 (a) of the Clayton Act,[1] as amended by the Robinson-Patman Act, has available to it, under § 2 (b) of the Act,[2] the defense that the discriminatory lower price was given "in good faith to meet an equally low price of a competitor," when the gasoline refiner-supplier shows that it gave the discriminatory price to only one of a number of its independently owned retail station customers in a particular region in order to enable that station to meet price reductions of a competing service station owned and operated by a retail chain selling a different brand of gasoline.

The Federal Trade Commission held the § 2 (b) defense to be unavailable under such circumstances. 55 F. T. C. 955. The Court of Appeals for the Fifth Circuit reversed, 294 F. 2d 465, and this Court granted certiorari, 368 U. S. 984, to review this difficult and important question concerning the scope and application of the § 2 (b) defense.

I.

The relevant facts are not seriously disputed.

Respondent, Sun Oil Company ("Sun"), is a New Jersey corporation and a major integrated refiner and distributor of petroleum products, including gasoline. At the time of the alleged violation here in issue, Sun marketed in 18 States a single grade of gasoline sold under the trade name "Sunoco." Sun does not ordinarily sell directly to the motorist, but usually distributes its gasoline and other related products to the consuming public

---

[1] 38 Stat. 730, as amended, 49 Stat. 1526, 15 U. S. C. § 13 (a).

[2] 49 Stat. 1526, 15 U. S. C. § 13 (b).

through retail service station operators who lease their stations from it.[3]

In 1955, Gilbert McLean was the lessee and operator of a Sunoco gas station located on the corner of 19th and Pearl Streets in Jacksonville, Florida. He was one of Sun's 38 retail dealers in the Jacksonville area, which Sun divided into three sales territories; McLean operated in a sales territory composed of eight Sun stations, one of which was only about 11 blocks away from McLean. Like almost all retail sellers of branded gasoline, McLean bought and sold only the petroleum products of a single supplier, here Sun. Notwithstanding, he was, as found below, and conceded here, an independent contractor and bore the direct and immediate risk of profitability of the station.

Commencing operation of the station in February 1955, McLean bought gasoline from Sun at 24.1 cents per gallon and resold it at 28.9 cents per gallon to the motoring public; the other Sun dealers in Jacksonville purchased from Sun at the same price and obtained the same 4.8-cent-per-gallon margin of gross profit.

In June 1955, about four months after McLean began business, the Super Test Oil Company, which operated about 65 retail service stations, opened a Super Test station diagonally across the street from McLean and began selling its "regular" grade of gasoline at 26.9 cents per gallon. It appears that this was Super Test's first and only station in Jacksonville. The record does not disclose that Super Test was anything more than a retail dealer;

---

[3] In 1956, Sun had a total of approximately 6,980 domestic dealers. In 1954, the year preceding the alleged violation, Sun was the thirteenth largest of the integrated oil companies. H. R. Rep. No. 1423, 84th Cong., 1st Sess. 23. Among United States industrial corporations of all types, it ranked forty-fourth in assets, thirty-sixth in net profits, and thirty-eighth in sales. S. Rep. No. 2810, 84th Cong., 2d Sess. 7.

nor does it indicate the source from which Super Test obtained its gasoline.

The two-cent-per-gallon difference in price between McLean and Super Test represented the "normal" price differential then prevailing in the area between "major" and "non-major" brands of gasoline. This "normal" differential represents the price spread which can obtain between the two types of gasoline without major competitive repercussions. Thus, McLean was apparently not adversely affected to any substantial degree by this first-posted price of Super Test.

Thereafter, however, Super Test sporadically reduced its price at its Jacksonville station, usually on weekends. Some of the price cuts were advertised in the local newspaper and all were posted on curbside signs. For example, on August 27, 1955, the Super Test station reduced its price to 21.9 cents a gallon and on the following day to 20.9 cents per gallon. While these lower prices were normally short-lived, at least one was maintained for a week. On the occasion of each price reduction by the Super Test station, McLean's sales of Sunoco declined substantially.

When Super Test began lowering its price below the normal two-cent differential, McLean, who was maintaining his price of 28.9 cents per gallon, from time to time protested to Sun and sought relief in the form of a price concession from it. For about four months, Sun took no action, but in December 1955, after further periodic price reductions by Super Test and a complaint by McLean that he would be forced out of business absent help from Sun, Sun told McLean that it would come to his aid in the event of further price cuts. When, on December 27, 1955, Super Test dropped its price for "regular" gasoline to 24.9 cents per gallon, McLean told Sun that he would have to post a price of 25.9 cents in order to meet the competition. On the same day, Sun gave McLean a price allowance or discount of 1.7 cents per gallon: McLean accord-

ingly dropped his retail price three cents per gallon, from 28.9 cents to 25.9 cents, thus reducing his gross margin from the prior 4.8 cents per gallon to 3.5 cents per gallon, the amount regarded by Sun as the minimum gross margin which should be earned by its retail dealers. In lowering his price to within one cent of Super Test's, McLean absorbed 1.3 cents and Sun 1.7 cents of the per gallon price reduction. No corresponding price reduction was given by Sun to any of its other dealers in the area.

Within a few days, Super Test further lowered its price to 23.9 cents per gallon. No further price cuts were made by either McLean or Super Test until mid-February 1956, when Super Test cut its price for "regular" gasoline to 22.9 cents per gallon. At about the same time, a general price war developed in the Jacksonville area and several other suppliers made price reductions. Sun then dropped its price equally to all of its dealers in the area. Notwithstanding a remarkable increase in his gallon sales after the December 27, 1955, price allowance to him and the reduction in his own resale price, McLean went out of business on February 18, 1956, two days after the outbreak of the general price war.[4] The exact reason for the failure of McLean's business does not appear; it is not clear that it was because of the price war.

---

[4] During the period from July through November 1955, McLean's monthly sales in gallons varied from a high of about 7,400 (July) to a low of approximately 5,900 (November). McLean cut his price on December 27, 1955; his December sales were 8,300 gallons. His sales in January 1956 jumped to over 32,000 gallons and continued at about the same rate into February until he discontinued business.

In July 1955, the month following its opening, Super Test sold just over 5,000 gallons of "regular" gasoline at its Jacksonville station; its monthly sales of "regular" thereafter varied from about 10,700 gallons (September) to slightly under 19,000 (December). In January and February 1956, Super Test's sales of regular exceeded 61,000 and 67,000 gallons, respectively.

During the period between the December 27, 1955, price reduction by McLean and the February 1956 date on which Sun extended its discount to all of its area dealers, a number of Sun dealers located at distances varying from less than a mile (about 11 blocks) to about three and one-half miles from McLean's station suffered substantial declines in sales of Sunoco gasoline. Some of these Sun dealers who testified below said that they saw former customers of theirs buying gas from McLean and two declared that their customers had told them that they switched to McLean because of his lower price. Some of these dealers complained to Sun about the favored treatment accorded McLean and, prior to the February general price reductions, unsuccessfully sought compensating discounts from Sun for themselves. Though three of these other Sun dealers ultimately went out of business, there is no indication that they did so as a result of the December price reduction to McLean.

In September 1956 the Federal Trade Commission filed a complaint against Sun charging it with illegal price discrimination in violation of § 2 (a) of the Clayton Act, as amended, and with entry into a price-fixing agreement with McLean in violation of § 5 of the Federal Trade Commission Act.[5] The Commission adopted the findings, conclusions and proposed order of the trial examiner and affirmed his initial determination that Sun had violated the provisions of both Acts, as charged. The Commission also found that there had been actual competitive injury to the nonfavored Sun dealers by virtue of Sun's discriminatory December 27 price allowance to McLean and rejected Sun's asserted defense under § 2 (b) of the Clayton Act because Sun was not meeting its own competition, that is a price cut by another wholesale seller, and because the allowance to McLean "was not made to meet a lower

---

[5] 38 Stat. 719, as amended by 52 Stat. 111, 15 U. S. C. § 45.

price made to [McLean] . . . by another supplier" but "to meet the competition of the Super-Test station across the street."

Considering Super Test to be an integrated supplier-retailer of gasoline, the Court of Appeals reversed, reasoning: first, that McLean was but a "conduit" for the marketing of Sun's products and therefore Sun, as a practical matter, was really competing with Super Test for sales of its gasoline; and second, that the price competition of Super Test was as much a threat to the continued existence of McLean as a customer of Sun as a direct competing lower offer to McLean would have been and it was not realistic to expect such an offer to be made to McLean. The Court of Appeals concluded that Sun was entitled, under the circumstances, to "assert the [§ 2 (b)] defense of meeting competition in good faith." 294 F. 2d, at 481. The Court of Appeals did not overturn the Commission's finding that Sun's discriminatory price concession to McLean had resulted in competitive injury to the other Sun dealers in McLean's area.

The Commission petitioned for a writ of certiorari to review the Court of Appeals holding that the § 2 (b) defense was available to Sun under the circumstances of this record; no review was sought of the Court of Appeals reversal of the Commission's findings that Sun had entered a price-fixing agreement illegal under § 5 of the Federal Trade Commission Act and that Sun's purpose in granting the lower price to McLean was to undercut, not meet, the price of Super Test.

The only issue thus before the Court is whether Sun is here entitled to avail itself of the § 2 (b) defense that its December 27 "lower price" to McLean was extended "in good faith to meet an equally low price of a competitor." If the defense is unavailable, there is no issue as to violation of § 2 (a) of the Clayton Act; respondent Sun does not dispute that the requisite elements of a price

discrimination otherwise illegal under § 2 (a) have been shown.

As indicated, the Court of Appeals assumed, as have a number of commentators on the case,[6] that Super Test was an integrated supplier-retailer of gasoline. The record does not support this conclusion, however, and therefore, as the case comes to us, availability of the § 2 (b) defense to Sun is determined on the assumption that Super Test was engaged solely in retail operations; similarly, since there is in the record no evidence as to Super Test's source of supply or the price at which it bought gasoline, we assume that Super Test was not the beneficiary of any enabling price cut from its own supplier.[7]

The precise question presented has not heretofore been resolved by this Court. The only reported judicial decision (other than that of the Court of Appeals in this case) considering the issue is a District Court opinion supporting the view of the Commission. *Enterprise Industries, Inc., v. Texas Co.,* 136 F. Supp. 420, reversed on other grounds, 240 F. 2d 457, cert. denied, 353 U. S. 965. The Commission itself has in the past taken a view contrary to the one urged here, but since 1956 has been maintaining its present position.

## II.

The context in which the conflicting contentions of both the Commission and respondent Sun must first be considered is that framed by the language of the statute itself. Section 2 (a) of the Clayton Act, as amended by the Rob-

---

[6] See, *e. g.*, Note, 62 Col. L. Rev. 171 (1962); Note, 1962 Duke L. J. 300; Note, 75 Harv. L. Rev. 429 (1961).

[7] Were it otherwise, *i. e.*, if it appeared either that Super Test were an integrated supplier-retailer, or that it had received a price cut from its own supplier—presumably a competitor of Sun—we would be presented with a different case, as to which we herein neither express nor intimate any opinion.

inson-Patman Act, makes it unlawful for "any person . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." [8]  Of course applicability of the statute depends upon the requisite involvement in interstate commerce.  As has been noted, there is no challenge here to the finding that Sun's actions were within the prohibitions of § 2 (a); the discrimination was found to have the statutorily requisite anticompetitive effects.

Section 2 (b) of the Act contains a proviso permitting a seller to rebut a *prima facie* case of discrimination in violation of § 2 (a) by "showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." [9]  This proviso is usually referred to

---

[8] Section 2 (a) provides in more extensive part:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

[9] Section 2 (b) provides in full text:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or

as the "good faith meeting competition" defense. The seller has the burden of bringing himself within the exculpating provision of § 2 (b), which has been interpreted to afford an absolute defense to a charge of violating § 2 (a), notwithstanding the existence of the statutorily prohibited anticompetitive effect, *Standard Oil Co.* v. *Federal Trade Comm'n,* 340 U. S. 231.

Reading the words to have "their normal and customary meaning," *Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, 388, the § 2 (b) phrase "equally low price of a competitor" would seem to refer to the price of a competitor of the seller who grants, and not of the buyer who receives, the discriminatory price cut. (In this case, this would mean a competitor of Sun, the refiner-supplier, and not a competitor of McLean, the retail dealer.) Were something more intended by Congress, we would have expected a more explicit recitation as, for example, is the case in § 2(a) in which the intent to give broader scope was expressly effected by the prohibition of price discriminations which, *inter alia,* adversely affected competition not only with the seller (in this case Sun) who grants the favored price, but with the knowing recipient thereof (in this case McLean) and "with customers of either of them." Thus, since Congress expressly demonstrated in the immediately preceding provision of the Act that it knew how to expand the applicable concept of competition beyond the sole level of the seller granting the discriminatory

---

facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

price, it is reasonable to conclude that like clarity of expression would be present in § 2 (b) if the defense available thereunder were similarly intended to be broadly read to encompass, as is urged, the meeting of lower prices set not only by the offending seller's competitor, but also by the purchaser's competitor. There is no reason appearing on the face of the statute to assume that Congress intended to invoke by omission in § 2 (b) the same broad meaning of competition or competitor which it explicitly provided by inclusion in § 2 (a); the reasonable inference is quite the contrary.

The fact that § 2 (b) permits a seller to meet the competitor's "equally low" price is similarly suggestive of an interpretation which limits application of the proviso to situations in which the seller's reduction in price is made in response to a price cut by its own competitor rather than by a competitor of its customer. Linguistically and practically, it makes but little sense to talk, for example, of a wholesaler's meeting of the "equally low" price of one of his purchaser's retail competitors. The reduced retail price of the purchaser's competitor will almost invariably be higher than the supplier's wholesale price; even in those instances in which this is not so, it cannot seriously be suggested that under § 2 (b) the wholesaler is entitled to reduce discriminatorily his wholesale price to the lower retail level. Such a result is not only economically unrealistic, but strains normal language use. Moreover, it is difficult to see what appropriately cognizable competitive interest Congress might be thought to have been serving in enacting a statute productive of such an anomalous result.

Recognizing the incongruity of such an interpretation, and having no need to go quite so far, respondent argues merely that as a wholesaler it is protected under § 2 (b) when it lowers its own price sufficiently to allow its retail dealer, in turn, to reduce his retail price to meet a com-

petitive retail offer. But this too extends the statute beyond its immediately apparent meaning; the language of the section contains no implication that it comprehends a two-stage price reduction effected by two separate economic units at different levels of distribution as the measure of setting the "equally low" price.[10]

Enough has been said to demonstrate that a reading in context of the § 2 (b) proviso to give its words their normal and usual meaning strongly suggests, though it does not inexorably compel, an interpretation of the defense contrary to that urged by respondent. Moreover, the narrower interpretation of the statute is consonant with overall rationality and broader statutory consistency and purpose, and effects a result compatible with legislative history and economic reality. We now turn to consideration of such other factors.

### III.

Prior to passage of the 1936 Robinson-Patman Act, § 2 of the Clayton Act prohibited price discriminations and allowed as one defense a demonstration that the price concession was "made in good faith to meet competition." 38 Stat. 730. Because of Congress' growing concern that this exemption was overly broad and did not sufficiently inhibit business concentration thought to be fostered in substantial part by unwarranted price favoritism shown by suppliers to large buyers, particularly large retail chains then threatening smaller local merchants, the Robinson-Patman Act was passed to strengthen the Clayton Act prohibitions on price discrimination. See, *e. g.*, H. R. Rep. No. 2287, 74th Cong., 2d Sess. 3–6; Rowe, Price Discrimination Under the Robinson-Patman Act (1962), pp. 3–24. Not only was § 2 (a) amended to eliminate cer-

---

[10] A reading of § 2 (b) such as Sun contends for would also make it difficult, if not impossible, to read sensibly the section's reference to the "services or facilities" of a competitor.

tain asserted weaknesses, but the § 2 (b) proviso legitimatizing discriminations made to "meet competition" was limited to protect only discriminations made "to meet an equally low price of a competitor."

The House Committee, in its report on the bill, said of the newly worded § 2 (b) proviso:

> "This proviso represents a contraction of an exemption now contained in section 2 of the Clayton Act which permits discriminations without limit where made in good faith to meet competition. It should be noted that while the seller is permitted to meet local competition, it does not permit him to cut local prices until *his competitor* has first offered lower prices, and then he can go no further than to meet those prices. If he goes further, he must do so likewise with all his other customers, or make himself liable to all of the penalties of the act, including treble damages. In other words, the proviso permits the seller to meet the price actually previously offered by a local competitor. It permits him to go no further." H. R. Rep. No. 2287, 74th Cong., 2d Sess. 16. (Emphasis supplied.)

While such language in the congressional materials suggests the reading limiting § 2 (b) to the meeting of the seller's own competition, it is, of course, not conclusive since not directed to the specific problem here presented. Neither the briefs nor the arguments of the parties nor of the *amici* have pointed to any more explicit congressional guide to resolution of the precise question before us. No more can be said than that there appears to be nothing in the legislative history to directly contradict what we deem to be the ordinary meaning of the statutory language or to indicate that a different reading was specifically intended; what few guides there are support the interpretation we here adopt.

## IV.

We thus turn to the fundamental purposes of the Robinson-Patman Act and the antitrust laws in general for guidance more impressive than that found in the recited legislative history.

Relying on the general purpose of the Act to protect the small independent businessman, respondent Sun argues that the statutory policy supports its price-cutting action, even though discriminatory, because that action was designed to protect and preserve a small independent businessman, McLean. It is asserted that the limited resources available to McLean bar his survival in a gasoline price war of any duration. McLean's small margin of profit, his relative inability to lower his retail price because a direct function of the price he pays his supplier, here Sun, and other factors make his continued independent existence in a present-day price war wholly dependent upon receipt of aid—in the form of a price reduction—from his supplier. Whatever their accuracy, these assertions ignore the other station operators—the nearby Sun dealers competing with McLean—who were also vitally interested in the particular competitive struggle to which Sun was moved to respond by making price concessions only to McLean. These dealers were hurt, it was found below, by Sun's discriminatory price to McLean and this finding is not challenged here by Sun. Their sales declined appreciably after the December 27, 1955, cut in price by Sun to McLean, and while perhaps not all of the attrition in sales was attributable to the fact that McLean was thereby enabled to drop his price, certain of the dealers were able to identify customers who, apparently retaining a preference for Sun products, shifted their patronage from the competing Sun stations to McLean.

It is asserted, in response, that the harm to competitors of McLean must be suffered as a consequence of the very competition which is the pervasive essence of our overall antitrust policies. As has been said in another context:

> "In any competitive economy we cannot avoid injury to some of the competitors. The law does not, and under the free enterprise system it cannot, guarantee businessmen against loss. That businessmen lose money or even go bankrupt does not necessarily mean that competition has been injured." H. R. Rep. No. 1422, 81st Cong., 1st Sess. 5–6.

But the mere recognition that harm sometimes may be a by-product of competition is the beginning, not the end, of analysis. Whatever the result here, someone may be hurt—to allow Sun to pursue its discriminatory pricing policy will, as has been indicated, harm other Sun dealers who compete with McLean; to prevent Sun from making discriminatory price allowances, it is asserted, will injure the McLeans of the competitive world. The alternative competitive injury to McLean, however, is not inevitable; Sun may have available to it courses of action which would afford protection to both McLean and the other Sun stations. See pp. 526–527, *infra*. Even if this were not so, we are not free on the basis of our own economic predilections to make the choice between harm to McLean, on the one hand, and to the other Sun operators, on the other, or to balance the comparative degree of individual injury in each instance; that choice is foreclosed by the determination in the statute itself in favor of equality of treatment. It is the very operators of the other Sun stations which compete with McLean who are the direct objects of protection under the Robinson-Patman Act. The basic purpose of the Act was to insure that such purchasers from a single supplier, Sun, would not be injured by that supplier's discriminatory practices. To be sure, the

§ 2 (b) exception is operative notwithstanding the incidence of damage to nonfavored purchasers, *Standard Oil Co.* v. *Federal Trade Comm'n, supra,* but, given the basic statutory purpose to prevent precisely such damage, the defense does not become applicable simply because the favored purchaser would be hurt absent the discriminatory price cut to him. If a threat of harm to the favored customer was itself enough, under § 2 (b), to immunize a discrimination, the § 2 (b) exception could largely nullify the prohibitions of § 2 (a).

Similarly, the mere fact that McLean was a small retailer does not make the good faith defense applicable. While, as noted, the immediate and generating cause of the Robinson-Patman amendments may have been a congressional reaction to what were believed to be predatory uses of mass purchasing power by chain stores, neither the scope nor the intent of the statute was limited to that precise situation or set of circumstances. Congress sought generally to obviate price discrimination practices threatening independent merchants and businessmen, presumably from whatever source. The House Committee declared its "guiding ideal" in proposing the amendments to be "the preservation of equality of opportunity as far as possible to all who are usefully employed in the service of distribution and production . . . ." H. R. Rep. No. 2287, 74th Cong., 2d Sess. 6. In short, Congress intended to assure, to the extent reasonably practicable, that businessmen at the same functional level would start on equal competitive footing so far as price is concerned.

An example will be helpful. Assume that a single store in a large retail grocery chain reduces, without the benefit of any corresponding reduction in price from its supplier, the price of a single and widely advertised staple food product. Is it to be supposed that the Congress which passed the Act would view this reduction as justifying,

under § 2 (b), another supplier's cut in his wholesale price of the same product to a large competing retail chain outlet, without that supplier's offering the same price concession to other smaller retail outlets which compete with both chain stores? Even assuming that the second chain did not predatorily seek the price concession from its own supplier, there can be but one answer to this question under the statute since allowance of such a discrimination would nullify the very equality which is sought to be protected by the Act. To allow the § 2 (b) defense to be so asserted would be directly contrary to the intent of Congress.

Stripped of the initial appeal arising from the fact that Sun was attempting to preserve, not a retail chain, but rather its own small dealer, McLean, the instant facts present, we think, no crucial variation from the example given.

The argument that if the problem actually posed by "small" McLean competing with "big" Super Test were put to Congress it would approve the course followed by Sun is not persuasive. Even if such congressional approval might be assumed—a perhaps unwarranted conclusion [11]—it is clear that Congress did not write or pass a statute which allowed or provided for distinction

---

[11] While subsequent legislative materials are neither appropriate nor relevant guides to interpretation of prior enactments, it is interesting to note that a Senate Select Committee on Small Business, reporting in 1956 on a New Jersey gasoline price war, concluded that the Federal Trade Commission should enforce the Act against "all instances of price discrimination," that such action might have stopped the price war in "its incipiency," and that the § 2 (b) defense should not be available to protect a supplier who discriminatorily lowered his price "not for the purpose of meeting the equally low price of a competitor but, rather, to enable some of his dealers to meet the prices charged by competitive gasoline retailers." S. Rep. No. 2810, 84th Cong., 2d Sess. 28–29.

between the posited grocery product case and the one now before us. To make the incidence of the § 2 (b) defense turn on the relative competitive strength of the particular favored customer *vis-à-vis* his price-cutting competitor is not only inapposite but without statutory warrant. The Act is of general applicability and prohibits discriminations generally, subject only to defenses not based upon size. Competitive ability or business size may properly be a measure of antitrust application in other contexts, but there is no basis for reading such a standard into § 2 (b) of this statute.

Limiting invocation of the § 2 (b) defense to those situations in which the discriminatory price cut is made in response to a lower price of the seller's own competitor comports, we think, not only with the objectives of the Robinson-Patman Act but with the general antitrust policy of preserving the benefits of competition.

To allow a supplier to intervene and grant discriminatory price concessions designed to enable its customer to meet the lower price of a retail competitor who is unaided by his supplier would discourage rather than promote competition. So long as the price cutter does not receive a price "break" from his own supplier, his lawful reductions in price are presumably a function of his own superior merit and efficiency. To permit a competitor's supplier to bring his often superior economic power to bear narrowly and discriminatorily to deprive the otherwise resourceful retailer of the very fruits of his efficiency and convert the normal competitive struggle between retailers into an unequal contest between one retailer and the combination of another retailer and his supplier is hardly an element of reasonable and fair competition. We see no justification for such a result in § 2 (b). Restriction of the defense to those situations in which a supplier responds to the price concessions of its own competitor—

another supplier—maintains general competitive equities. Fairness demands neither more nor less. We discern in § 2 neither a purpose to insulate retailers from lawful and normal competitive pressures generated by other retailers, nor an intent to authorize suppliers, in response to such pressures created solely at the retail level, to protect, discriminatorily, sales to one customer at the expense of other customers.

It is argued, however, that to deny Sun the right to reduce its prices as it did here is to impair price flexibility and promote price rigidity, the very antithesis of competition. We think that the contrary is the case. While allowance of the discriminatory price cut here may produce localized and temporary flexibility, it inevitably encourages maintenance of the long-range and generalized price rigidity which the discrimination in fact protects. So long as the wholesaler can meet challenges to his pricing structure by wholly local and individualized responses, it has no incentive to alter its overall pricing policy. Moreover, as indicated, the large supplier's ability to "spot price" will discourage the enterprising and resourceful retailer from seeking to initiate price reductions on his own. Such reasoning may be particularly applicable in the oligopolistic environment of the oil industry.[12]

We see no reason to permit Sun discriminatorily to pit its greater strength at the supplier level against Super Test, which, so far as appears from the record, is able to sell its gasoline at a lower price simply because it is a more efficient merchandiser, particularly when Super Test's challenge as an "independent" may be the only meaningful source of price competition offered the "major" oil companies, of which Sun is one.

---

[12] See generally H. R. Rep. No. 1423, 84th Cong., 1st Sess.; see Note, 29 U. of Chi. L. Rev. 355, 365–366 (1962).

## V.

Respondent Sun makes several other arguments in support of its position. First, it asserts that the interpretation of § 2 (b) urged here by the Commission completely ignores the competitive realities of the gasoline vending business. In essence, Sun argues that, practically viewed, Super Test was not merely a competitor of McLean, but also a competitor of Sun. Oil companies, whether major or minor, integrated or nonintegrated, it is asserted, compete not at the wholesale or jobber level, but almost exclusively at the retail level.[13] All competition, Sun says, is directed to sales of the final product—gasoline—to the motoring consumer, and anything that threatens to reduce the sales of a branded gasoline at the retailer's pump is a threat to the supplier whose business is a direct function of its stations' marketing success or failure. It is contended that the individual station is but a "conduit" for the supplier and that Sun is thus in competition with Super Test, considered even only as a retailer.[14]

In a very real sense, however, every retailer is but a "conduit" for the goods which it sells and every supplier could, in the same sense, be considered a competitor of retailers selling competing goods. We are sure Congress had no such broad conception of competition in mind when it established the § 2 (b) defense and, certainly, it

---

[13] It appears that there may be some competition, at least among the "major" oil companies, to win the more efficient jobbers and retailers to distribution of their brands of gasoline; a similar competition may exist for preferred locations.

[14] The "lower offer" which, under this analysis, Sun was meeting by its price cut to McLean was the retail price posted by Super Test. Obviously, to the extent that under any such theory the supplier attempted to set, or was responsible for setting, the retail price, there would be inherent antitrust problems arising from possible existence of illegal price-fixing agreements.

intended no special exception for the petroleum industry. It is difficult to perceive convincing reasons rationally confining the thrust of respondent's argument to an area narrow enough to preclude effective emasculation of the prohibitions on discrimination contained in § 2 (a). Only differences of degree distinguish the situation of the gasoline station operator from that of many other retail outlets, and in numerous instances the distinction, if any, is slight. The "conduit" theory contains no inherent limitations and its acceptance would so expand the § 2 (b) defense as to effect a return to the broader "meeting competition" provision of the Clayton Act, which the Robinson-Patman Act amendments superseded.

Sun also argues that the effect of a decision holding the § 2 (b) defense unavailable to it in these circumstances will be to prolong and aggravate the destructive price wars which periodically reoccur in the marketing of gasoline. Whether relevant or not, this contention is best put wholly to one side. Such price warfare appears to be caused by a number of basic factors, not the least of which are industry overcapacity and the propensity of some major refiners to engage in so-called "dual marketing" under which, in order to increase their overall sales and utilize idle facilities, they not only sell branded gasoline to their own dealers but also sell unbranded gasoline to independent retailers or jobbers, often at a lower price. See S. Rep. No. 2810, 84th Cong., 2d Sess. 16–19. Whatever we do here can neither eliminate nor mitigate the major economic forces which are productive of these price wars. Moreover, it is wholly unclear whether allowance of the price discrimination prolongs or shortens the war's duration. (It might be noted that the war was not narrowly contained by Sun's actions here.) There are logical arguments on both sides of the question and none are wholly persuasive. Extensive discussion of the various reasoning would serve no useful purpose. As one study

concludes after canvassing the contentions: "one simply cannot be certain." De Chazeau and Kahn, Integration and Competition in the Petroleum Industry (1959), 481; and see generally, *id.,* pp. 477–483; S. Rep. No. 2810, 84th Cong., 2d Sess. 19–23.

Respondent urges that the interpretation of § 2 (b) which we have adopted unfairly forces its small retailer, McLean, to bear alone what to him is the economically insufferable burden of the entire retail price reduction. This, however, erroneously poses the choice as merely twofold—aid to the retailer by an unlawfully discriminatory price reduction, or no aid at all—and misconceives the availability of other alternatives.

Preliminarily, it must be recognized that we are not dealing here with the situation in which one supplier reduces its prices and another supplier thereupon reduces its prices to prevent its customer from shifting his business to the competing supplier; this is the more normal circumstance and the § 2 (b) defense is usually available.

Even in the limited situation with which we here deal—in which the competing retailer cuts his price without his supplier's aid—Sun, as a wholesaler, may reduce its price uniformly and nondiscriminatorily to competing purchasers from it so as to preclude the probable incidence of the substantial anticompetitive effects upon which violation of § 2 (a) is here grounded. Sun recognizes, as it must, that it has this choice, but argues that in order to eliminate the possibility of having even a broad price cut deemed illegal under § 2 (a), it would of necessity have to extend the benefits of the concessions to all of its dealers in an unwarrantedly wide geographic area, perhaps nationwide. This, it asserts, is required because whatever line it seeks to draw, there will inevitably be some dealer who because of geographic proximity will be deemed to have been illegally discriminated against. The mere existence of a competitive continuum, however, does not

require that market limits be indefinitely extended with absurd results in the form of unwarranted nationwide or otherwise overly broad measures of competitive impact. In appraising the effects of any price cut or the corresponding response to it, both the Federal Trade Commission and the courts must make realistic appraisals of relevant competitive facts. Invocation of mechanical word formulas cannot be made to substitute for adequate probative analysis.[15] In cases in which the economic facts so indicate, carefully drawn area submarkets may be the proper measure of competitive impact among purchasers.[16]

Alternatively, since Sunoco stations, though largely independently owned, operate under leasing, merchandising, advertising and other policies set by Sun, other opportunities are available to Sun to strengthen its dealers in competing with other stations.

Rejecting these and other actions [17] as reasonable business alternatives,[18] Sun asserts that the only course realis-

---

[15] Cf. *American Oil Co.*, —— F. T. C. ——, F. T. C. Dkt. No. 8183, CCH Trade Reg. Rep. ¶ 15,961 (June 27, 1962) (dissenting opinion of Commissioner Elman).

[16] Nothing we say in this case—involving injury only to so-called "secondary-line" competition, that is, competition among buyers—is inconsistent with *Federal Trade Comm'n* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, in which, in the context of asserted injury to "primary-line" competition, that is, competition with the seller, it was held that a "discrimination" under § 2 (a) of the Act comprehends a "difference in price" among even non-competing purchasers, the legality or illegality of which depends upon whether or not there is likely to be substantial injury to competition among sellers.

[17] Since Sun made no attempt here to utilize a so-called "feathered" discount to its dealers, under which the amount of the price allowance diminishes as it reaches stations further away from the center of the price war, we need not expressly pass upon such practice. However, it may be noted that a properly designed and limited price

tically open to it is to change the nature of its distribution system by effecting some sort of further forward vertical integration, all at the expense and to the detriment of the very independent merchants—the individual station operators—whom the Robinson-Patman Act was intended to preserve and protect. It may be that active pursuit of such a course by Sun, involving the elimination of independent retail dealers, would be a greater evil than allowance of discriminations such as are here involved; such a broad determination of economic policy, however, is not for us to make here. We are not interpreting a broadly phrased constitutional provision, but rather a narrowly worded statutory enactment with specific prohibitions and specific exceptions. Compare *Standard Oil Co.* v. *United States,* 337 U. S. 293, 311–312.

In any event, we see no evidence that such forward integration is inevitable or required as the only feasible alternative. It has not yet occurred and suppliers such as Sun have discerned sound and apparently persuasive reasons for heretofore rejecting direct ownership and

---

reduction system fashioned in such a manner might, under appropriate circumstances, be found to have obviated substantial competitive harm to the other Sun dealers and thereby negated a violation of § 2 (a) such as is here charged. Of course, improperly designed or too sharply drawn "feathering" gradations may produce precisely the same effect as no gradation at all, and consequently fall within the same ban as an outright illegal discrimination.

[18] Insofar as Sun is free to pursue certain alternative courses of action, it may convert what was a competitive struggle simply at the retail level into one involving a supplier. But, by definition, Sun will not have acted in such a manner as to produce substantial anticompetitive effects at the secondary level, *i. e.,* among Sun's customers. Moreover, not only will there be no price cut by Sun at the expense of nonfavored dealers, but the broader nature of the response required will serve as an inhibition on utilization of price reductions to pursue essentially anticompetitive objectives and will preclude undue restraint upon the enterprising retailer who is willing, and presumably able, to lower his price without the aid of his supplier.

operation of their stations; it is wholly reasonable to believe that such incentives persist.

Having consciously chosen not to effect direct distribution through wholly owned and operated stations, Sun cannot now claim for itself the benefits of such a system and seek to inject itself as a supplier into what on this record appears as a struggle wholly between retailers, when such interference favors one of Sun's customers at the expense of others.

Thus, consistent with overall antitrust policy and the language and very purposes of the Robinson-Patman amendments, we conclude that § 2 (b) of the Act contemplates that the lower price which may be met by one who would discriminate must be the lower price of his own competitor; since there is in this record no evidence of any such price having been set, or offered to anyone, by any competitor of Sun, within the meaning of § 2 (b),[19] Sun's claim to the benefit of the good-faith meeting of competition defense must fail. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

Separate memorandum of MR. JUSTICE HARLAN, in which MR. JUSTICE STEWART joins.

I agree with the conclusion reached by the Court that, on the present record, Sun has failed to make out a defense under § 2 (b) of the Clayton Act, as amended by the Robinson-Patman Act.

However, instead of reversing the judgment below I would remand the case to the Commission so as to afford opportunity for the introduction of further evidence.

---

[19] In this posture of the case, we find it unnecessary to pass upon the Commission's apparently alternative theory that a lower competitive offer to McLean himself was a prerequisite to Sun's invocation of the § 2 (b) defense.

The Court recognizes, *ante*, p. 512, note 7, that a different case would be presented "if it appeared either that Super Test were an integrated supplier-retailer, or that it had received a price cut from its own supplier—presumably a competitor of Sun." It is true that the burden of proof in establishing a § 2 (b) defense rests on Sun, and that it must therefore bear the responsibility for any gaps in the record. But it is equally true that we are here dealing with an extremely difficult question arising under a singularly opaque and elusive statute.

If, as the Court acknowledges, it may be important to know whether Super Test was integrated, or whether it received a price cut from its supplier, I see no reason to foreclose development of the relevant facts in this proceeding. This case is one of far-reaching importance in the administration of the Robinson-Patman Act, and yet by our final disposition of it we leave unanswered as many questions as we have resolved. If a more complete record would permit resolution of these additional questions, we do both litigants an injustice by refusing to allow such a record to be made. For the Commission, which has had trouble making up its own mind in this area,* has as much interest as the respondent in definitive answers to these perplexing problems.

---

*At one time, as indicated by various letters written by the then Director of the Bureau of Investigation in 1954, the Commission took the position that the § 2 (b) defense was available under the facts before us today. See Hearings on Distribution Problems before Subcommittee No. 5 of the House Select Committee on Small Business, 84th Cong., 1st Sess. 459–463, 852–853 (1955).