PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

HOOVER COLOR CORPORATION,
Plaintiff-Appellant,

v.                                                                No. 98-2238

BAYER CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Jackson L. Kiser, Senior District Judge.
(CA-96-841-R)

Argued: September 22, 1999

Decided: December 3, 1999

Before WILKINS, WILLIAMS, and MOTZ, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Motz wrote the
opinion, in which Judge Wilkins and Judge Williams joined.

_____

COUNSEL

ARGUED: Dennis P. Brumberg, BRUMBERG, MACKEY &
WALL, P.L.C., Roanoke, Virginia, for Appellant. Thomas Demitrack,
JONES, DAY, REAVIS & POGUE, Cleveland, Ohio, for Appellee.
ON BRIEF: Mark A. Black, BRUMBERG, MACKEY & WALL,
P.L.C., Roanoke, Virginia, for Appellant. Susanne H. Deegan,
JONES, DAY, REAVIS & POGUE, Cleveland, Ohio; Michael F.
Urbanski, WOODS, ROGERS & HAZLEGROVE, Roanoke, Vir-
ginia, for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A buyer of synthetic iron oxide pigment brought this action asserting that the company selling the pigment engaged in discriminatory pricing in violation of the Robinson-Patman Act. The district court found that the seller established an affirmative defense by demonstrating that it set its prices in a good faith attempt to meet competition in the marketplace and, therefore, granted the seller summary judgment. This "meeting competition" defense, however, requires proof of a good faith response not just to general competition in the marketplace, but to the "equally low price of a competitor." Because disputed facts remain as to whether the seller's prices were the result of a good faith attempt to meet a competitor's prices, we reverse and remand for further proceedings.

I.

Hoover Color Corporation is one of several primary distributors of Bayferrox, a synthetic iron oxide pigment used to color paint, plastics, and building and concrete products. Hoover filed this suit against the producer of Bayferrox, Bayer Corporation, for price discrimination under the Clayton Act, as amended by the Robinson-Patman Anti-Discrimination Act, 15 U.S.C. § 13 (1994). Section 2(a) of the Robinson-Patman Act provides in pertinent part:

> It <u>shall be unlawful</u> for any person engaged in commerce, in the course of such commerce, either directly or indirectly, <u>to discriminate in price between different purchasers of commodities</u> of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where <u>the effect of such discrimination may be substantially to lessen competition</u> or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly

2

receives the benefit of such discrimination, or with custom-
ers of either of them . . . .

15 U.S.C. § 13(a) (emphasis added).

Hoover alleges that Bayer discriminated in favor of its large dis-
tributors of Bayferrox, in violation of the Robinson-Patman Act, by
implementing a volume-based incentive discount pricing system.
Under this system, the price each distributor paid for Bayferrox
depended on the total amount of the product it purchased. Hoover,
which purchased substantially smaller quantities of Bayferrox than
either of its two competitors--Rockwood Industries and Landers-
Segal Company (Lansco)--paid significantly more for the Bayferrox
than its competitors. For example, in 1992, Bayer discounted Hoo-
ver's comparatively small 2.6 million pound purchase of Bayferrox
by only 1% off the distributor market price; but Lansco, by purchas-
ing 13.3 million pounds of Bayferrox, received a 6% discount and
Rockwood, by purchasing 27.1 million pounds, received the equiva-
lent of an additional 4% discount beyond Lansco's. In addition, the
prices Bayer charged Rockwood also might be reduced if Rockwood
presented Bayer with lower price offers from other sellers and Bayer
chose to meet those offers. In fact, from 1985 until 1994, the
Rockwood-Bayer agreements required Rockwood to present to Bayer
any lower offers it received from other reputable producers; only if
Bayer did not match the price within 14 days did Rockwood have the
option of purchasing from the alternate producer. No distributor knew
of these or any other provisions in its competing distributors' con-
tracts.

For invoicing purposes, the prices paid by each distributor were
based on the volume purchased the previous year. If a distributor
bought more or less Bayferrox than it had the previous year (thus enti-
tling it to a different discount), Bayer did not charge or refund the dif-
ference to the distributor until the end of February of the following
year. Hoover claims that, particularly because of the year delay in
obtaining the benefit of a greater volume purchase, the lower prices
offered to its larger competitors were not functionally available to it
even if the same prices were theoretically available to all distributors.

Bayer instituted its system of volume-based incentive discounts in
1980. At that time, Bayer was building a large manufacturing plant

3

in New Martinsville, West Virginia, which it completed at the end of 1980. Hoover maintains that Bayer pursued its volume-based pricing strategy, which assertedly substantially lessened competition among Bayferrox distributors and unfairly injured Hoover, in order to obtain the bulk orders necessary to make profitable the New Martinsville plant, with its attendant high fixed costs.

The district court granted Bayer's motion for summary judgment. The court found that the "uncontroverted evidence. . . establishe[d] that Bayer offered its lower prices to Rockwood and Lansco out of a good faith competitive necessity to meet competition for their business," thus meeting the requirements for an affirmative defense under § 2(b) of the Robinson-Patman Act. Section 2(b) provides:

> [N]othing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

15 U.S.C. § 13(b).

Hoover appeals.

II.

Congress enacted the Robinson-Patman Act to prevent a large buyer from "secur[ing] a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability." FTC v. Morton Salt Co., 334 U.S. 37, 43 (1948).

Originally, the Clayton Act had provided that "nothing contained in it should prevent discrimination in price . . . on account of differences in . . . quantity of the commodity sold." Id. (internal quotation marks omitted). The original Clayton Act had also "allowed as one defense a demonstration that the price concession was `made in good faith to meet competition.'" FTC v. Sun Oil Co., 371 U.S. 505, 516 (1963) (quoting 38 Stat. 730 (1914)). After some years under this stat-

4

utory regime, Congress determined that the protection afforded small buyers was "`inadequate, if not almost a nullity.'" Morton Salt, 334 U.S. at 43 (quoting H.R. Rep. No. 74-2287, at 7 (1936)). Accordingly, Congress passed the Robinson-Patman Act, which amended the Clayton Act "to limit `the use of quantity price differentials to the sphere of actual cost differences,'" id. (quoting H.R. Rep. No. 74-2287, at 9 (1936)), and to limit the meeting competition defense "to protect only [price] discriminations made `to meet an equally low price of a competitor.'" Sun Oil, 371 U.S. at 517.

The Robinson-Patman Act thus seeks to increase competition by regulating large buyers' economic power. When one or a few large buyers dominate a market in which many suppliers compete for sales, these buyers can, if unrestrained, force the suppliers to sell at such low prices as to prevent new buyers from entering the market. Section 2(a) of the Act prohibits this. But because § 2(a) does not confine its ban on price discrimination to those situations in which the desire for increased competition would justify legal constraints, Congress provided sellers with the § 2(b) "meeting competition" affirmative defense (albeit in a more limited form than in the original Clayton Act).

This scheme has not enjoyed wide approval. Indeed, professional and academic opinion has "almost uniformly condemned" the Robinson-Patman Act. See, e.g., Richard A. Posner, The Robinson-Patman Act: Federal Regulation of Price Differences 1 (1976). Criticism has ranged from its drafting, see Automatic Canteen Co. of America v. FTC, 346 U.S. 61, 65 (1953) (Frankfurter, J.) (noting that "precision of expression is not an outstanding characteristic of the Robinson-Patman Act"), to its underlying rationale, see Robert H. Bork, The Antitrust Paradox 382 (1978) (describing the Robinson-Patman Act as "the misshapen progeny of intolerable draftsmanship coupled to wholly mistaken economic theory"). We must nonetheless attempt to interpret and apply the Robinson-Patman Act, whatever its faults, as written and intended by Congress.

The Supreme Court has provided us with substantial guidance in this pursuit. The Court has explained that to establish a prima facie case of price discrimination under § 2(a), a plaintiff must prove: (1) a seller sold the same product at different prices to different purchas-

5

ers, see FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 550 (1960), and (2) such differences in price reasonably may cause an injury to competition. See Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 435 (1983). A plaintiff may demonstrate the first element--the price difference--through evidence of volume-based discounts that are theoretically, but not functionally, available to all buyers. See Morton Salt, 334 U.S. at 42. The second element--possible injury to competition--so obviously follows from the first that it "is established prima facie by proof of a substantial price discrimination between competing purchasers over time." Falls City, 460 U.S. at 435; see also Morton Salt, 334 U.S. at 50 ("It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a `reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers.").

If a buyer makes out a prima facie case of price discrimination under § 2(a), a seller can nonetheless avoid liability under § 2(b) if it can demonstrate that it set its prices in a good faith attempt to meet "an equally low price of a competitor." 15 U.S.C. § 13(b). This affirmative defense "requires more than a showing of facts that would have led a reasonable person to believe that a lower price was available to the favored purchaser from a competitor." Falls City, 460 U.S. at 439. Rather, to establish the defense, a seller must also prove that "the `lower price . . . was made in good faith to meet' the competitor's low price." Id. (quoting 15 U.S.C. § 13(b)) (emphasis added by Supreme Court). Good faith is at the heart of the defense, and good faith "`is a flexible and pragmatic, not technical or doctrinaire, concept. . . . Rigid rules and inflexible absolutes are especially inappropriate in dealing with the § 2(b) defense; the facts and circumstances of the particular case, not abstract theories or remote conjectures, should govern its interpretation and application.'" United States v. United States Gypsum Co., 438 U.S. 422, 454 (1978) (quoting Continental Baking Co., 63 F.T.C. 2071, 2163 (1963)).

Because of this emphasis on intent and good faith and because the seller has the burden of proving the affirmative defense, courts have

6

rarely granted a seller judgment as a matter of law on the basis of the defense. As the Eleventh Circuit recently explained:

> [A] legal conclusion that the meeting competition defense has been established is rarely, if ever, reachable. . . . [I]n the normal course of affairs the summary judgment movant does not bear the burden of proof at trial. Here our movant does, for the statute places the burden of establishing the defense on the [defendant] not the [plaintiff]. As is well established, in a summary judgment proceeding the party against whom the burden of proof falls at trial faces a challenge more difficult than otherwise. . . . Here the appellees must do more than put the issue into genuine doubt; indeed, they must remove genuine doubt from the issue altogether. Second, the test for establishing the section 2(b) defense makes the removal of genuine doubt well nigh impossible. The test for establishing the defense is particularly fact-bound. . . . As the standards suggest, these facts are more attuned with a jury's discovery capabilities than a judge's, particularly so in a complex antitrust context like the present one. Furthermore, the concept of good faith lies at the core of the defense. Like the concept of "good faith" in other legal standards, the concept here concerns itself with the belief of those invoking its protection. Thus, issues of credibility are inherently bound up with a decision on the section 2(b) defense and in a summary judgment proceeding, of course, issues of credibility are beyond a judge's ken.

> Altogether, these factors weigh heavily against any attempt to dispose of section 2(b) issues on summary judgment.

Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1425-26 (11th Cir. 1990) (citations and quotation marks omitted); see also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1048 (9th Cir. 1981) (holding that even an "admittedly small doubt" that a seller's price reductions were a good faith response to competition required reversal of the district court's judgment as a matter of law to the seller), cert. denied, 459 U.S. 825 (1982).

III.

Notwithstanding the heavy burden imposed on a seller attempting to obtain summary judgment on the basis of the meeting competition defense, the district court found that Bayer had met that burden here. After assuming, without deciding, that Hoover had made out a prima facie case of price discrimination under § 2(a), the district court concluded that Bayer had established its entitlement to the affirmative defense in § 2(b). The following footnote from the district court's opinion reflects its approach:

> The meeting competition defense permits exactly what § 2(a) was amended to prohibit: large purchasers using their greater purchasing power to force sellers to sell their goods to the large purchasers at prices lower than the sellers sell to small purchasers. It seems to me, that in a case such as the one at bar, where the seller can document competition in the market and the threat of reduced sales as a result of that competition, Congress' goals in passing Robinson-Patman are effectively circumvented and the seller necessarily can not be held liable for price discrimination.

If a seller could prove the meeting competition defense under the Robinson-Patman Act by "document[ing] competition in the market and the threat of reduced sales as a result of that competition," as the district court believed, we would agree that indisputably Bayer has established the defense in this case. Such a standard, however, would enable nearly all sellers to demonstrate that they price their goods or services in response to competition in the market. Most markets are competitive and pricing is therefore almost always driven by considerations of competitive pressures, whether from direct competitors who provide a highly similar good or from those who provide a suitable substitute.

Therefore, if § 2(b) of the Robinson-Patman Act provided a defense to every seller who could document a good faith attempt to meet general competition in the market place, then the defense would, as the district court recognized, virtually obliterate the protection Congress sought to provide buyers in § 2(a) of the Act. We need not consider whether anything would be left of § 2(a)'s ban on discrimi-

8

natory pricing under such a statutory scheme because, although Congress provided a generous defense in § 2(b), that defense is considerably more limited than the district court acknowledged. Indeed, as noted above, the original Clayton Act provided a broad meeting competition defense very similar to that envisaged by the district court; however, Congress specifically passed the Robinson-Patman Act to amend the Clayton Act and circumscribe that defense. See Sun Oil, 371 U.S. at 516-17.

In § 2(b), as amended, Congress provided sellers a defense when that prohibition would have a direct anti-competitive effect. Section 2(b) provides a seller no defense from § 2(a)'s ban on discriminatory pricing when that pricing is based on general competition in the market, but affords a seller an absolute affirmative defense when its prices are set "in good faith to meet an equally low price of a competitor or the services or facilities furnished by a competitor." 15 U.S.C. § 13(b) (emphasis added).

Moreover, the Supreme Court has made it plain that§ 2(b) must be applied in accordance with its literal language and is not to be interpreted more expansively. The Court has repeatedly emphasized the necessity of proof of a good faith attempt to match an individual competitor's price. For example, in FTC v. A.E. Staley Mfg. Co., the Court explained that to avoid liability under the § 2(b) "meeting competition" defense, the seller must "at least" show that its "price was made in good faith to meet a competitor's" and that a reasonable person would believe that "the granting of a lower price would in fact meet the equally low price of a competitor." 324 U.S. 746, 759-60 (1945); accord Falls City, 460 U.S. at 438; Gypsum , 438 U.S. at 451. Hence, the Court itself has recognized that § 2(b)"places emphasis on individual competitive situations, rather than upon a general system of competition." Staley Mfg., 324 U.S. at 753.

To be sure, a seller can establish that it acted in good faith to meet a competitor's price by "efforts falling short of interseller verification." Gypsum, 438 U.S. at 454. For example, a seller can rely on evidence that it received "reports of similar discounts from other customers," or that it "was threatened with termination of purchases if the discount were [sic] not met." Id. at 455. A seller can also demonstrate its good faith by showing that it acted to"corroborate the

9

reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data," or that it relied on "past experience with the particular buyer in question." Id. Moreover, proof of "[a] good faith belief, rather than absolute certainty" is all that is necessary. Id. at 453. But, in order to avail itself of the defense a seller must, in the final analysis, demonstrate to the satisfaction of "a reasonable and prudent person" that it offered a lower price with a good faith belief that "the granting of a lower price would in fact meet the equally low price of a competitor." Staley Mfg., 324 U.S. at 759-60.

The question before us then is whether the uncontroverted evidence establishes that Bayer set its volume-based discount prices in a good faith effort to meet an equally low price offered by a competitor.

IV.

Bayer claims that undisputed evidence does establish that the volume discounts "were a good faith response to competitive offers that were available to [its] distributors." Brief of Appellee at 38. Bayer relies on three kinds of evidence to support its assertion of the defense.

First and principally, Bayer relies on evidence that the market for iron oxides was apparently very competitive. For example, in 1992 Rockwood's parent company purchased a potential competing supplier of synthetic iron oxides, thereby decreasing Rockwood's demand for Bayferrox and increasing its market power against Bayer. Moreover, imported goods from China, Mexico, India, Austria, and elsewhere provided distributors with lower-cost alternatives to Bayferrox. Given these available alternatives and the competitive market for iron oxides, Bayer argues that Rockwood and other distributors would purchase more iron oxide pigments from Bayer if the price were lower, and less if the price were higher. This evidence undoubtedly demonstrates the generally competitive nature of the iron oxide market, but it says nothing about actual or imminent lower price offers made by Bayer's competitors and matched by Bayer with its volume discount pricing structure. The fact that a market may have been "intensely competitive" in no way precludes a determination that

10

the seller may have violated the Robinson-Patman Act. See William Inglis, 668 F.2d at 1046-47.

Bayer also relies on two specific instances in which Rockwood and Lansco presented it with lower prices from a competitor and asked Bayer to meet those prices. This evidence also fails to prove Bayer's entitlement to the meeting competition defense. Although it may well establish that Bayer's distributors twice received lower price offers from other suppliers and sought to have Bayer match such offers, the evidence cannot establish that Bayer set its prices "to meet" a competitor's lower price because Bayer expressly refused to meet the competitor's lower prices on both occasions. Because Bayer did not match either offer, Bayer cannot rely on these threats to establish incontestably that its volume discounts constituted a "good faith" attempt "to meet an equally low price of a competitor." 15 U.S.C. § 13(b).

Finally, Bayer presents statements from Rockwood and Lansco that they would purchase less Bayferrox if Bayer did not reduce its prices. Such evidence may well establish the existence of a competitor's offer, or threatened offer, to which Bayer reasonably responded by increasing its prices. See Great Atl. & Pac. Tea Co. v. FTC, 440 U.S. 69, 74, 83-84 (1979) (holding that seller proved meeting competition defense by producing evidence during FTC factfinding hearing that it lowered its price in response to a statement by a large, long-time buyer that seller's bid was far "out of line" with "a [competitor's] bid in [the buyer's] pocket.").

Bayer's evidence, at least at this juncture, however, is considerably less compelling than that in the case on which Bayer so heavily relies --Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.--one of the very few instances in which a court has upheld summary judgment to a seller on the basis of the meeting competition defense. 971 F.2d 37 (7th Cir. 1992). In Reserve Supply, the defendant sellers offered substantial evidence that a customer, or potential customer, asked them to match a price offered by one of the sellers' competitors. See id. at 44. Furthermore, the sellers demonstrated that, pursuant to their established practices, they had compared the lower price offers to other reports of competitive prices in the marketplace to substantiate the bona fides of these offers before acting to meet the com-

11

petitors' prices. See id. Again, Bayer has offered no evidence equivalent to that offered by the sellers in Reserve Supply.

Moreover, and perhaps more importantly, Hoover has proffered significant and direct evidence which, if believed, could rebut Bayer's assertion of the § 2(b) defense. This evidence also distinguishes the present case from Reserve Supply, in which the plaintiffs proffered no direct evidence to rebut the sellers' proof that they matched specific competitive offers. Hoover first points to evidence related to a possible alternative motive for Bayer's volume-based discount pricing system. Hoover offered undisputed evidence that Bayer wanted to maintain a high volume of business in Bayferrox to make cost effective its large plant in New Martinsville. Indeed, several of Bayer's own executives so testified. For example, one explained that "the spirit behind all of these volume-based contracts was to begin to load the facility that we had just built" and affirmed that this goal continued through 1997. Another executive similarly testified that "the intent [of the volume-based discounts] . . . was to offer a structure that would give [Bayer] the volume utilization of the [New Martinsville] plant." Hoover maintains that this evidence demonstrates that Bayer's sole motive in using volume discount pricing was not to meet a competitor's price, but rather to develop the large volume of sales necessary to utilize the New Martinsville plant profitably.

Bayer acknowledges, as it must, that one of the reasons it engaged in volume discount pricing was to keep the New Martinsville plant increasingly active. Bayer asserts, however, that"[t]here is . . . no inconsistency" between its need to increase volume for the New Martinsville plant and its claim that volume discount pricing was simply a "respon[se] to the competitive offers." Although this assertion is true, it lends little support to Bayer's § 2(b) defense. Although increasing volume and responding to competitive offers are potentially consistent, they are not necessarily consistent. A seller's attempt to set prices in order to satisfy the high volume necessary to operate its plant successfully certainly does not establish that it also set prices in a good faith effort to meet a competitor's prices, and Bayer must prove the latter. On the present record, in view of the evidence as to the New Martinsville plant and its impact on Bayer's business, a fact-finder could reasonably conclude that Bayer engaged in volume discount pricing not to match a competitor's prices but simply to grow

12

its business with the kinds of "aggressive price reductions condemned by the Robinson-Patman Act." William Inglis , 668 F.2d at 1047.

Hoover also proffered evidence that the threats Bayer received from its larger distributors--that they would purchase less Bayferrox if no price reduction was forthcoming--may not have played a role in motivating Bayer's volume discounts. In his deposition testimony, Rockwood's president stated that Bayer "minimized" Rockwood's repeated general warning about the availability of lower-priced alternatives to Bayferrox and "didn't give [the warning] a lot of credibility." Bayer "basically said [substitution of lower priced imported iron oxide pigments] wasn't that big a concern." Hoover also points to the fact that Bayer, not Lansco, initiated negotiations for the 1994 Bayer-Lansco agreement. A possible inference from this uncontroverted fact is that Lansco did not have a lower offer from a competitor to motivate renegotiation of its contract with Bayer to obtain more favorable terms. A factfinder need not, but reasonably could, conclude that this undisputed evidence indicates that the threats of Bayer's distributors to change suppliers did not influence Bayer's pricing structure.

Furthermore, provisions in the 1985 and 1990 Rockwood-Bayer agreements lend additional support for the possible conclusion that Bayer did not create the volume-based discount pricing system to match the offers of a competitor. These agreements contain, in addition to the provision for volume discounts, a separate express requirement that Rockwood provide Bayer the opportunity to match any lower price offer before Rockwood accepted such an offer. Thus, wholly apart from the volume-based discounts, the contracts provide an explicit mechanism for Bayer to receive and match competing offers. Given this evidence, a factfinder could reasonably determine that Bayer did not need or intend the volume discounts to match competing offers.

For the foregoing reasons, we must conclude that at this juncture Bayer has not demonstrated its entitlement as a matter of law to the "meeting competition" defense. Accordingly, we reverse the district court's grant of summary judgment to Bayer on this basis. We note that because the district court assumed without deciding that Hoover made out a prima facie case of price discrimination under § 2(a), it

13

did not reach any of Bayer's alternative arguments. We similarly do not reach those arguments and express no opinion as to their validity.

REVERSED AND REMANDED

14