**AMERICAN MOTORS CORPORATION,**
American Motors Sales Corporation, Petitioners,

v.

The **FEDERAL TRADE COMMISSION,**
Respondent.

No. 16841.

United States Court of Appeals
Sixth Circuit.

Sept. 29, 1967.

Forrest A. Hainline, Jr., Detroit, Mich., for petitioners, Cross, Wrock, Miller, Vieson & Kelley, Glen R. Miller, J. Theodore Everingham, Detroit, Mich., on the brief.

Daniel H. Hanscom, Federal Trade Commission, Washington, D. C., for respondent, James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., on the brief.

Before O'SULLIVAN and CELEBREZZE, Circuit Judges, and BATTISTI, District Judge.*

O'SULLIVAN, Circuit Judge.

This appeal presents the petition of American Motors Corporation and American Motors Sales Corporation [1] to review a decision of the Federal Trade Commission which found them guilty of violating Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).[2]

American Motors manufactures and sells to retailers various electric appliances—refrigerators, ranges, home freezers, automatic washers, clothes dryers and air conditioners—under the trade names of Kelvinator and Leonard. Its business is nationwide. During the time in suit, these retailers were divided by American Motors into two groups, identified in the record as "merchandise distributors" and "regular dealers." The so-called merchandise distributors were B. F. Goodrich Co., Akron, Ohio; Consumers Power Co., Jackson, Michigan; the Alabama Power Co., Birmingham, Alabama; and Sterchi Brothers Co., Nashville, Tennessee. The regular dealers consisted mainly of department and appliance stores, some 6,000 retail outlets in all. In its complaint filed January 13, 1959, the FTC accused American Motors of unjustifiably allowing the "merchandise distributors" to purchase its products at discounts of slightly more

* Honorable Frank J. Battisti, U. S. District Judge for the Northern District of Ohio, sitting by designation.

1. American Motors Sales Corporation is a wholly owned subsidiary of American Motors Corporation. We do not need to discuss these corporations separately, and they shall herein be referred to together as "American Motors."

2. 15 U.S.C. Section 13
    (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * *

than 3% of the sales price charged the "regular dealers".[3]

American Motors admitted its differential pricing practices, but defended its conduct on two grounds: that such action did not effect a lessening of competition or tend "to injure, destroy or prevent competition," as those terms are used in the Act; and that its price differentials were permissible under Section 2(a) of the Act because they made only "due allowances for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities [were] to such purchasers sold or delivered." The Commission, however, found that absent cost justification, American Motors' practices were violative of the Act, and further held that American Motors failed to sustain its burden of proof of cost justification for its disparate pricing. In its opinion, the Commission reversed the Initial Decision of its hearing examiner who had ordered the Commission's complaint dismissed on the basis that, although a prima facie case had been made against American Motors, the company had proved its defense of cost justification.

On this appeal, American Motors argues, first, that the Commission failed to demonstrate that its pricing practices injured or threatened injury to competition; second, that the Commission erred in finding that American Motors had not sustained its cost justification defense; and third, that the enforcement order of the Commission exceeded its authority.

### 1) Prima facie injury to competition.

The Commission's case in chief was bottomed entirely upon a stipulation of facts in which it was agreed that over a substantial period of time, American Motors had regularly given its merchandising distributors a discount on the price charged for the same merchandise to its regular dealers. The stipulation further provided that:

"(10) In a substantial number of instances retail outlets owned, operated, or controlled by or affiliated with the previously mentioned merchandising distributors are in direct competition with one or more of the independent stores [regular dealers] referred to in paragraph (9) above in the resale at retail of electric appliances sold by respondent American Motors Sales Corporation."

and in its paragraph (13) set out the facts upon which the Commission relied for its finding that the pricing practices so affected competition as to be violative of the Act, as follows:

"(a) Twenty-four out of twenty-six of such witnesses would testify that the price differentials referred to in paragraph (12) of this stipulation in many instances exceeded the amount of net profit received by them on sales of such items during the years specified;

"(b) That the witnesses have lost sales of electric appliances of like kind to competitors where the amounts of the differentials in the lower retail prices charged by such competitors were equal to the differentials referred to in paragraph (12) of this stipulation."

In an appendix to the stipulation, examples of the price differentials were set out; the discounts given to "merchandise distributors" on the prices charged to "regular dealers" ranged up to approximately 3.4% on sales of refrigerators, electric ranges, home freezers, and air conditioners, and up to about 4.4% on sales of laundry equipment, including automatic washers and dryers. The largest differential was on the "Foodarama" refrigerator, for which the price was $417.75 to the merchandising distributor and $432.35 to the regular dealer, a difference of $14.60 per unit. The smallest dollar differential was $3.25 for a wringer washer model, which sold

---

3. The complaint spans the period 1956 to 1959, although evidence in the record indicates that three of the favored distributors first began receiving price discounts in 1939, 1949, and 1954, respectively.

to the merchandising distributor for $71.75 per unit and to the regular dealer at $75.00.

The stipulation, in addition to setting out the agreed upon facts, authorized the Commission to "consider all matters stipulated, together with such reasonable inferences which may be drawn therefrom, in arriving at a decision in this proceeding."

From the foregoing, and relying first upon the above-quoted subparagraphs (a) and (b) of paragraph 13 of the stipulation, the Commission found that:

"Price differentials of the order of magnitude demonstated in this proceeding which can result in the loss of sales of products as between competitors buying at the differing prices and which differentials exceeded in many instances the net profits on the sales of the items involved in the years indicated for the regular dealers, are substantial."

and concluded:

"the lower prices charged the favored dealers had the capacity to injure competition and gave rise to the probability that they would do so."

■ We are indeed impressed that the Commission's evidence to support its claim of injury or threatened injury to competition was meager, but we believe that it was sufficient as a prima facie showing and put the burden upon American Motors to establish a cost justification for its pricing practices. Having in mind that American Motors' business was nationwide, and that during a six months' period from March 1, 1959, to August 31, 1959, the total volume of American Motors sales of the involved appliances was $38,707,000.00, of which the merchandising distributors accounted for $2,269,874.00, it cannot be said that it was error for the Commission to find that the price advantage enjoyed by the merchandising distributors might lessen or tend to injure, destroy or prevent competition between the favored group and the regular dealers.

American Motors, however, argues that the stipulated fact that some 24 out of some 6,000 regular dealers would testify that "in many instances" the price differentials "exceeded the amount of net profit received by them on sales of such items during the years specified" is meaningless because "net profit" is not identified as before or after taxes, and because year end or distress sales could produce the same situation regardless of the price differentials. It argues also that the statements by these same witnesses that they "lost sales of electric appliances of like kind where the amounts of the differentials in the lower retail prices charged by such competitors were equal to the differentials referred to in paragraph (12) of the stipulation," is likewise of no significance, absent an identification of "such competitors" as being the favored merchandising distributors, some disclosure of the number and frequency of the loss sales, and a connection between the loss sales and the price differentials.

■ These contentions, we believe, are unmeritorious. We need reply to them only to this extent: The Act does not require that discriminations in price have in fact an adverse effect on competition, only that they "may" have such effect. Corn Products Refining Co. v. Fed'l Trade Commission, 324 U.S. 726, 742, 65 S.Ct. 961, 969, 89 L.Ed. 1320, 1334 (1945). Even though the experience of 24 out of 6,000 regular dealers may not be typical of a more substantial number of them, it would not be invalid simply to conclude that the dealer who buys his appliances for $5.00 or $10.00 cheaper than his direct competitor is likely thereby to have a starting competitive advantage.

The language of the Supreme Court in Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 50, 68 S.Ct. 822, 830, 92 L.Ed. 1196, 1206 (1948) is, in our view, dispositive of this matter. The Court there said:

"It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe

to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers. This showing in itself is sufficient to justify our conclusion that the Commission's findings of injury to competition were adequately supported by evidence."

Unless the discounts afforded by American Motors can unequivocally be said to have no impact on competition, or unless they can be cost-justified, the objective of the Act is clear:

"In short, Congress intended to assure, to the extent reasonably practicable, that businessmen at the same functional level *would start on equal competitive footing so far as price is concerned.*" FTC v. Sun Oil Co., 371 U.S. 505, 520, 83 S.Ct. 358, 367, 9 L.Ed.2d 466 (1963). (Emphasis supplied.)

█ It was enough, therefore, that the admitted facts permitted an inference that there was a reasonable possibility that the pricing practices may have had the effect of injuring competition. Corn Products Refining Co. v. Federal Trade Commission, supra. We cannot intrude into this case our own interpretation of the implications suggested by the stipulations:

"[T]he Supreme Court has held that 'The weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn from them is for the Commission.' Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927)." Atlantic Refining Co. v. Federal Trade Commission, 344 F.2d 599, 606 (CA 6, 1965).

The Commission made out a prima facie case of violation of the Act.

2) Cost justification.

█ American Motors essayed to establish that its disparate treatment of its merchandising distributors and its regular dealers was justified because such system made "only due allowance for differences in the cost of * * * sale * * * resulting from the differing methods * * * in which such commodities [its appliances] are to such purchasers sold or delivered." 15 U.S.C. 13(a). It was its burden to prove this assertion. Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 44, 45, 68 S.Ct. 822, 92 L.Ed. 1196, 1203 (1948); United States v. Borden Co., 370 U.S. 460, 467, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962). We share the view of the Commission's hearing examiner that American Motors met its burden in this regard. We accordingly reverse the decision of the Federal Trade Commission and vacate its order.

American Motors' answer to the complaint denied the charged violation and averred that its pricing program was cost justified. In preparing its case, it retained one William J. Warmack to make a survey of its pricing practices to support its affirmative defense. Warmack, a C.P.A. since 1933, was then in private practice as a consultant and specialist on Robinson-Patman pricing matters; formerly he had been employed by the Federal Trade Commission from 1929 to 1946, and from 1936 to the end of his association with the agency he was primarily engaged in inquiries and investigations in connection with the cost studies involved in the FTC's administration of the Robinson-Patman Act. Mr. Warmack's eminence in the involved field and his qualifications to make the required study were not, and are not, questioned by the Commission.

His study consisted of an examination of the sales practices of American Motors, as revealed by its relevant books and especially designed time records for the six months' period March 1 to August 31, 1959, and for the entire fiscal year ending September 30, 1958. The report [4] which eventually emerged, dated April 28, 1960, declared that the basis for the lower prices given the four mer-

4. Relevant portions of Warmack's report are included as an Appendix to this opinion.

chandising distributors, as contrasted with American Motors' regular dealers, was the result of the lower costs of marketing American Motors' products through such merchandising dealers. This cost savings was represented primarily by the fact that American Motors' sales employees at all levels, in 19 zones throughout the country, were able to devote less time to the merchandising distributors than to the regular dealers. The report pointed out that "sundry functions performed by the District Managers (salesmen), and to some extent by Zone Managers and Branch Managers, in serving dealers [regular dealers] are not required in serving merchandising distributors," generally because of the organization and available staff of the latter as compared with the former; it went on to note what these functions were:

"(1) Determining the standing and general reputation of the dealer in the community and his demonstrated merchandising ability in the local trade.

(2) Presentation and demonstration of products, product features and advantages, available and applicable merchandising plans and programs, and the general operating policies and practices of the zone as the 'distributor' and the American Motors Corporation as the 'manufacturer.'

(3) Assisting the dealer in developing sales and merchandising plans applicable to the relative size (sales volume) of the dealership and the economic scale of the area he serves.

(4) Assisting the dealer in the training of retail salesmen through organized training programs or meetings on specific subjects.

(5) Soliciting orders for products in quantities and model assortments consistent with dealer's ability to merchandise and within the extent of his financial responsibility and ability to pay.

(6) Assisting dealer in securing wholesale financing (floor-plans) when necessary, and retail financing (time-payment sales); also periodic inventory checks on floor-planned products."

The report concluded with the observation that American Motors price discount of approximately 3.38% was substantially less than the cost savings it experienced in doing business with its merchandising distributors.

At the hearing before the Commission's examiner, begun on May 3, 1960, the report was introduced into evidence as American Motors' Exhibit No. 1. Warmack testified as to its preparation and the validity of its conclusions, and declared that its results were typical of the entire national market served by American Motors. Attorneys for American Motors then indicated that their case in support of their clients' defense of cost justification was completed. At that point, counsel supporting the FTC complaint asked for and were given an adjournment so that they could examine the report's underlying data and otherwise analyze it in preparation for cross-examination of Warmack. Unfortunately, before the resumption of the hearing on November 29, 1960, Mr. Warmack died. FTC counsel did not object to the report because of their inability to cross-examine Warmack so that his testimony and his report (Exhibit 1) remained in evidence. That testimony and the report had, in our view, made out a prima facie case of cost justification.

After opportunity to study the Warmack report, the FTC began its rebuttal to American Motors' case. As stated in the Initial Decision of the hearing examiner,

"Complaint counsel's principal witness in opposition to the cost study was Mr. William S. Opdyke of the Commission's accounting staff. Mr. Opdyke's testimony was devoted almost entirely to point out instances of 'miscoding' in respondents' time study; that is, instances where on a salesman's report a dealer would be listed as a regular dealer, when in fact he was a merchan-

dising distributor outlet, and vice versa." [5]

The proofs, however, disclosed that the instances of such "miscoding" (some 27 out of 14,000 contact reports studied) were so minimal as in no way to impair the conclusions of the report. The hearing examiner's observation that, "giving full effect to the miscoding, they reduce the cost differentials by only negligent amounts, a few one-hundredths of 1 percent," is not now challenged. Some other attacks upon Warmack's testimony made before the FTC have been abandoned in the FTC address to us.

We read the Commission's contention that American Motors failed to meet its burden of proof to be a claim that American Motors failed to establish that its classification of its customers into merchandising distributors on the one hand and regular dealers on the other was reasonable. The FTC does not assert that B. F. Goodrich and the other three merchandising distributors are improperly grouped together. But it contends that the 6,000 regular dealers are not sufficiently alike among themselves and, as a group, not sufficiently different from the merchandising distributors to justify their separate classification. Relying chiefly on United States v. Borden Company, et al., 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962) the FTC urges that the regular dealers do not, as a class, possess the needed "selfsameness" or "homogeneity," to warrant their being studied together in determining American Motors' cost of selling to them. The implication the Commission draws from this lack of "selfsameness" is that the cost of selling to some *individual* regular dealers (determined on the basis of time spent and services performed) might, in some instances, have been the same as, or cheaper than, the cost of selling to one or more of the four favored merchandising distributors; and that American Motors' study is invalid because it did not demonstrate that as to each regular dealer the cost of selling to it exceeded the price differential or was equal, as to each dealer, to the average of such extra cost.[6]

To support its claim that American Motors failed to establish homogeneity of its regular dealers, the Commission relied chiefly upon the evidence's disclosure of the following:

a) The 6,000 regular dealers were of various sizes from the standpoint of the volume of their sales; some were single appliance stores, others carried multiple sales outlets; the sales volume of some was greater than that of some of the merchandising distributors, some were less; some of the regular dealers were *located* in department stores doing an annual multimillion dollar business "in all lines." These facts were produced by an FTC employee who testified that his investigation of this subject was limited to interviews with, and study of the methods of, some 20 to 30 of the regular dealers. (The fact that much of his information was hearsay is not controlling here.)

b) Counsel for the Commission elicited answers from American Motors supervisory people that in a few instances some of the merchandising distributors were given the same sorts of services from the sales organization of American Motors as was regularly given to the regular dealers. Likewise, it was developed that in some instances some of the regular dealers did not always receive or need all of the six categories of added services, the cost of which was the basis of American Motors' claim of additional expense of marketing its appliances through them.

---

5. Opdyke's emphasis on miscoding exposes the extensive detail of Warmack's study and the fact that he recorded separately the costs assigned to the regular dealers and those assigned to the merchandising distributors.

6. Although in reversing its hearing examiner the Commission relied upon some evidence that was rejected by him, it does not here argue that such exclusion was error.

a) Dealing with the first attack, we do not consider that the fact that some of the regular dealers enjoyed as much or more sales volume as the merchandising distributors, that some were single appliance stores and others had multiple outlets, and that some were located in large department stores, destroys the validity of their being classified together for the purpose of cost justification. The needed homogeneity is not dependent upon the size or style of doing business, provided American Motors' method of using them to market its products exposed it to the "selfsameness" and uniformity in its burden of costs. The evidence disclosed that the merchandising distributors supplied for themselves a sales staff which carried on at their own expense the functions which American Motors had to perform, at its expense, for the regular dealers. As the following summary in appellant's brief indicates:

"A merchandising distributor will employ in each of its zone or branch offices qualified appliance personnel who devote the majority of their time to the merchandising and selling of appliances. Such personnel devote considerable attention to the merchandising distributor outlets. Training of personnel in the merchandising distributor outlets, both in appliance products and in the sale and promotion of such products, is largely done by regional and zone personnel of the merchandising distributor. Further, a merchandising distributor will hold meetings for its outlets for the purpose of carrying out programs suggested by petitioners. On the other hand, the regular dealers, including those with multiple outlets, do not have personnel who perform the functions performed by petitioner AMSC's district managers and by similar personnel of the merchandising distributors."

The following question and answer in the examination of the Manager of Sales Operations of American Motors is also partially illustrative:

"Q. Is it fair to state that you are saying that a regular dealer will not have the personnel that a merchandising distributor had to perform these functions that your District Managers perform?

"A. Generally speaking, regular dealers do not have the staff of personnel with which to perform these functions even where a regular dealer would be classified as a multiple outlet dealer. They do not staff themselves for this particular purpose."

In considering this subject, the hearing examiner observed:

"Essentially, the validity of [petitioner's] cost study turns on the question whether in selling to regular dealers [petitioner's] employees usually perform certain significant functions which ordinarily they are not called upon to perform for merchandising distributors."

and then concluded:

"We have a cost study prepared by a very competent accountant with broad background and experience in Robinson-Patman Act cases. The classification of customers appears logical and reasonable and is supported by substantial evidence. Unquestionably there are substantial *differences* in [petitioner's] *cost* of serving the two groups." (Emphasis supplied.)

The homogeneity required in this regard does not lie in the size or style of the regular dealers but in the uniformity and "selfsameness" of American Motors' cost of doing business with them.

b) We do not believe that the conclusions of the Warmack study are destroyed because of the evidence that there were some departures from the otherwise uniform differences between American Motors' method of dealing with its two classes of customers. The claim of such destruction arises mainly from answers elicited from representatives of American Motors' sales executives.

American Motors' Manager of Sales, a Mr. Wilson, testified:

"Q. Is it not probable, Mr. Wilson, that among all of these some 6,000 active regular dealers there are some of

these active regular dealers for whom *each* of these six functions is not performed by the District Managers that serve them?

"A. That some of these are not performed?

"Q. Yes.

"A. Yes, that is what I stated before, I thought. I would have to qualify that on the basis that I do not think that anyone is qualified to answer that question, Mr. Muntsinger. I can only assume that there are certain duties that are indicated here that would possibly not be performed with *all dealers 100 percent.*

"Q. It is more than a possibility—is that not a probability, Mr. Wilson?

"A. I would say that it is a probability." (Emphasis supplied.)

Mr. Wilson went on to say:

" * * * there may be instances where our District Managers may have to assist a merchandising dealer outlet. This is one of the responsibilities of theirs, of course, to be available if necessary to assist wherever they are called upon."

Referring to the six categories of special services to regular dealers as set out in Exhibit 1, Mr. Wilson replied:

"A. I would once again have to answer on the basis that these six items shown here represent a duty of District Managers generally, set forth what their duties are in the handling of regular dealers. I do not think anyone can answer your question or is qualified to answer your question *that each and every one of these duties applies to each and every regular retail operation.*" (Emphasis supplied.)

We will not further extend this opinion by additional quotations. Those set out would be the strongest support for FTC's attack. It seems obvious to us that such departures from absolute uniformity were inevitable, and had American Motors' witnesses denied their possibility or their probability we would be hard put to believe them. They do not,

in our view, impair the substantiality of the proof of cost justification.

In its Findings of Fact the Commission said:

"44. * * *

"Respondents failed to show *that its regular nonfavored dealers, especially those with multiple outlets, did not perform these same functions for themselves.* [Those performed by the merchandising distributors]

"45. From the facts related above, it is found that among respondents' 6,000 active regular dealers, *there are some that have the staff to perform the six enumerated functions and who do not have each of such functions performed for them by respondents' salesmen.* It is further found that among the multiple-outlet regular dealers, large department stores with multimillion annual sales volumes and other large dealers, *there are some who did, in fact, perform many of the enumerated functions for themselves.*

"46. Respondents' cost study, by averaging the time spent by its personnel on all non-favored customers treated as a group, eliminated for separate consideration the cost of selling to individual members of the non-favored group, *which in some instances probably would have required the same or even less time to service than that required for merchandising distributors.*" (Emphasis supplied.)

We consider these findings clearly erroneous. The attorney Eugene Rupert Webb, field investigator for the Commission, testified that he interviewed 20 or 30 regular dealers, including the proprietors of some of the department stores, but he pointed to no evidence that any of them did, in fact, perform for themselves the functions which added to American Motors' cost of doing business with them. Whatever evidence there was of the possibility or probability of minimal departures from rigid uniformity does not justify the above overbroad inferences of fact.

The Commission understandably placed chief reliance upon United States v. Borden Company, et al., 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962) for its claim that American Motors failed to make out a defense of cost justification. That *Borden* (dealing with two dairies, the Borden Company and Bowman Dairy Company) has much in common with the case at bar cannot be gainsaid. We consider, however, that clear distinctions will emerge from a comparison of the proofs of cost justification there relied upon by the respondents Borden, et al., with the Warmack study and testimony. The price differentials made by Borden were between its chain store and its independent store customers, and it relied in part for its claim of extra cost of doing business with the independent stores upon the extra personnel required to service them. It also relied in part upon the greater volume of purchasing by the chain stores; it gave graduated volume discounts to all the independents, but gave the chain stores a flat discount higher than the highest volume discount to the independents. The following should be sufficient to expose controlling differences between the Warmack study and the Borden case proofs:

1. In *Borden* the cost savings alleged to have been experienced with the chain stores was arrived at by lumping all of such savings together and striking an average. Of this, the Supreme Court said:

"Turning first to Borden's justification, we note that it not only failed to show that the economies relied upon were isolated within the favored class, but affirmatively revealed that members of the classes [chain stores] utilized were substantially unlike in the cost saving aspects considered. For instance, the favorable cost comparisons between the chains and the larger independents were for the greater part controlled by the higher *average volume* of the chain stores in comparison to the *average volume of the 80-member class* to which these independents were relegated. * * * This volume gap between the larger independents and the chain stores was further widened *by grouping together the two chains, thereby raising the average volume of the stores of the smaller of the two chains* in relation to the larger independents. Nor is the vice of the Borden class justification solely in the *paper* volumes relied upon, for it attributed to many independents cost factors *which were not true indicia of the cost of dealing with those particular consumers.*" (Emphasis supplied.) 370 U.S. at 469, 470, 82 S.Ct. at 1314.

In contrast to the foregoing, the Warmack report,

a) Did not *average* the volume of sales or the lesser cost of selling to the respective merchandising distributors. Warmack made his study by separate zones and, in each, *separately* analyzed the cost savings experienced in doing business with B. F. Goodrich, Alabama Power Company, Consumers Power Company, and Sterchi Brothers, as compared with the cost of doing business with the regular dealers in the particular zone under examination.[7]

7. "Q. Now, you have looked at that summary, would you state for the record, please, the amount of the cost differential for each of the four named merchandising distributors in the 7 zones covered by the study?
"A. Yes, would you like me to give you those figures?
"Q. Yes, I'd like to have them stated for the record, please.
"A. For B. F. Goodrich, cost differentials—cost savings as between the cost of serving regular dealers and cost of serving Goodrich for the Atlanta Zone in 1959, was 5.82 percent; New Orleans, 5.73 percent; Cleveland Zone, 7.62 percent; Dallas Zone, 8.44 percent; Detroit Zone, 3.72 percent; Pittsburgh Zone, 7.14 percent; Seattle Zone, 8.49 percent, and the total average cost savings for the group would be 5.94 percent.
"In the case of Alabama Power Company served in the New Orleans Area, the cost differential, that is, the cost savings, is 5.68 percent for 1959. In the case of Consumers Power Company,

b) Did not attribute to its regular dealers "cost factors which were not true indicia of the cost of dealing with those particular consumers [here regular dealers]." Borden, 370 U.S. at 470, 82 S.Ct. at 1315. In each zone analyzed, Warmack actually studied the time reports of all American Motors personnel who were giving service either to the regular dealers or to the merchandising distributors, or to both. It is true that Warmack did not make a detailed report as to the extra cost of doing business with each of the 6,000 dealers, but notwithstanding the long study made of the underlying data of the Warmack report by the Commission's expert, Opdyke, and the field examination by its lawyer investigator, the Commission failed to point to one individual dealer who was not enjoying the extra services the cost of which was part of the justification for the price differentials. The admitted minimal departures from strict uniformity did not, in our view detract from the legitimacy of Warmack's conclusions.

2. In Borden, the cost studies relied upon were obviously prepared without the extensive refinements and detail present here. The studies appeared to be made on estimates, as the following sampling of observations in the Borden opinion reveals: "To illustrate, each independent was assigned a portion of the total expenses involved in daily cash collections, although it was not shown that all independents paid cash and in fact Borden admitted only *"that a 'large ma-*

jority' did so". 370 U.S. at 470, 82 S.Ct. at 1315. (Emphasis supplied.) "Bowman's studies indicated only that a *large majority* of independents took these services on a daily basis." Ibid. (Emphasis supplied.) "On the basis of its studies Bowman *estimated* that *about two-thirds* of the independent stores received the 'optional customer service' on a daily basis and that *'most store customers* pay the driver in cash daily.'" Id. at 466, 82 S.Ct. at 1313. (Emphasis supplied.)

The Warmack study did not rely on *majorities, estimates, or approximations.* For its preparation, Warmack studied *all* the retail outlets in a particular zone and *all* of the transactions in that zone over the period of the study. Warmack testified that the studies made were sufficiently extensive in area and time to be typical of the entire United States. The Commission does not contend otherwise. We think that, considering that perfection cannot be obtained, what Warmack did can fit into the Supreme Court's recognition in *Borden* that though *arbitrary* classifications cannot be used,

"A balance is struck by the use of classes for cost justification which are composed of members of such self-sameness as to make the averaging of the cost of dealing with the group a valid and reasonable indicium of the cost of dealing with any specific group member. High on the list of 'musts' in the use of the average cost of customer groupings under the proviso of § 2(a) is a close resemblance of the indi-

---

served in the Detroit Area, the cost savings, that is, the cost differential, is 3.95 percent.

"In the case of Sterchi, served in the Atlanta—New Orleans Zone; in the Atlanta Zone, cost differential is 5.99 percent; New Orleans Zone differential is 6.12 percent, and the average for the two is 6.04 percent.

"Q. Mr. Warmack, in your answer, you did define this term cost differential which we use in this cost study, but I think for the record it might be helpful if you will just tell us again what do we mean by cost differential here?

"A. Well, it's the difference in the cost of serving, in this instance, regular deal-

ers, as compared with the cost of serving merchandising distributors. \* \* \* The cost savings in every instance, except in the case of the Detroit Zone, equal or exceed the discounts complained of in this lawsuit."

For a period in 1959 the discounts given to Consumers Power on laundry equipment exceeded the cost differential by about one-half of one percent. By the time of trial, however, this had been corrected so that the discount given was substantially less than the cost saving in doing business in Detroit with Consumers Power Company.

vidual members of each group *on the essential point or points which determine the costs considered.*" 370 U.S. at 468–469, 82 S.Ct at 1314. (Emphasis supplied.)

The FTC asks, and we have indulged, generous inferences to support its prima facie case of violation. We fear that they ask us to employ a different and narrower standard in judging the appellant's proofs. There was an early view that did require a cost justification to be shown as to each particular buyer, but the Supreme Court recognized the impracticability and unfairness of such a standard.

"Although the language of the proviso, with some support in the legislative history, is literally susceptible of a construction which would require any discrepancy in price between any two purchasers to be individually justified, the proviso has not been so construed by those charged with its enforcement. The Government candidly recognizes in its briefs filed in the instant case that '[a]s a matter of practical necessity * * * *when a seller deals with a very large number of customers, he cannot be required to establish different cost-reflecting prices for each customer.*' In this same vein, the practice of grouping customers for pricing purposes has long had the approval of the Federal Trade Commission. We ourselves have noted the 'elusiveness of cost data' in a Robinson-Patman Act proceeding. Automatic Canteen Co. [of America] v. Federal Trade Comm'n, 346 U.S. 61, 68, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953). In short, to completely renounce class pricing as justified by class accounting would be to eliminate in practical effect the cost justification proviso as to sellers having a large number of purchasers, thereby preventing such sellers from passing on economies to their customers. It seems hardly necessary to say that such a result is at war with Congress' language and purpose." United States v. Borden Co., 370 U.S. at 468, 82 S.Ct. at 1313 (Emphasis supplied.)

And in its decision in Minneapolis-Honeywell Regulator Co., 44 FTC 351, the Federal Trade Commission had occasion to say:

"Cost studies of the sort presented in this matter ordinarily do not afford precise accuracy but must necessarily embrace a number of conjectural factors and allocations. There is inherent in them a reasonable margin of allowable error. Where they are made in good faith and in accordance with sound accounting principles, they should be given a very great weight. Respondent had an extensive cost study made by an independent firm of accountants and auditors which disclosed cost justification for the price differentials resulting only from brackets 1 through 3A. It apparently was made with considerable care and great particularity of detail. Although basic questions may properly be raised with respect to the soundness of certain of the procedures and allocations upon which the cost differentials were determined, respondent's effort represents a fair and objective study of the problem which was probably done as well as it could be done under the circumstances. Respondent's burden under the Act is very great and it should have a liberal measure of consideration when it becomes apparent that it has made sincere and extensive efforts to discharge that burden. We have accordingly accepted the results of the cost study as fairly reflecting respondent's cost differentials within a reasonable margin of error."[8]

But here the Commission seems to be reverting to its former, harder policy re-

---

8. It should be noted that Warmack testified that the methods used in his study were consistent with those traditionally employed by the Commission in previous Robinson-Patman cases. Indeed, during his preparatory work he consulted with Commission personnel in an effort to assure that his study conformed with acceptable practices, and was never told that it did not. No challenge is made to these assertions; but the Commission dispatches the subject in its brief by

ferred to in the *Borden* opinion; it seems to require not only a showing that the cost of doing business with one group of purchasers is more expensive than with another on the basis of services performed and time spent, but a showing as well of what the average cost of doing business with the member of the more expensive group is, *and* a demonstration that in this case, the extra cost of doing business with the regular dealers shall, as to every such dealer, equal or exceed the involved price differential. We are not sure that we fully understand just what vice the Commission finds in American Motors' cost showing, and it may be its position that such cost justification must be established upon a store-by-store or dealer-by-dealer basis; it may be also that because one dealer has only one appliance store, another has several stores, and a third is located in a department store, the *homogeneity* referred to in *Borden* is missing, even though the element of extra cost is of the same character as to all of such dealers. We consider that the Commission here is saying that in an enterprise of the size of American Motors, it is virtually impossible to establish a cost justification it will accept.

We hold that the quoted admission of some exceptions did not impair the probative worth of American Motors' cost justification proofs. It made out its case and we consider that FTC applied impermissible standards in attacking it.

We reverse the order of the Commission and direct dismissal of the complaint.

3) The Commission's order.

In addition to its cease and desist command, the Commission's order required that American Motors obtain advance approval of any preferential pricing, regardless of its plan of operation, which may thereafter be initiated. The order reads:

"It is ordered that respondents American Motors Corporation and American Motors Sales Corporation, and their respective officers, agents, representatives and employees, directly or through any corporate or other device, in connection with the sale or distribution of household appliance products in commerce, as 'commerce' is defined in the Clayton Act, as amended, do forthwith cease and desist from establishing or following any price structure, system, schedule, or list that results in respondents' charging different prices for goods of like grade and quality to different groups or classes of customers where said differences in price purportedly reflect only due allowance for differences in the costs of manufacture, sale or delivery, unless respondents submit to the Federal Trade Commission, at least sixty (60) days prior to the effective date of such price differences, a written statement with all necessary underlying data (including evidence that the price structure, system, etc., and its basis have been made known to all of the respondents customers) in support of the cost justification of such differences, and the Commission approves the asserted cost justification."

■ Although we are remanding this matter to the Commission with instructions to dismiss the complaint, we think it appropriate to say that the requirement, in effect, of advance approval of *any* system, even though claimed to be permissible, goes beyond the enforcement power of the Commission. Section 2(a) of the Act, 15 U.S.C. § 13(a), makes lawful disparate pricing practices "which make only due allowance for differences in the cost, [etc.] * * *" Nothing in that provision requires advance approval to do that which is lawful. Recognizing the broad choice of enforcement methods available to the Commission, see Sandura Company v. FTC, 339 F.2d 847, 860 (CA 6, 1964), and cases cited therein, we would hold that the requirement of advance approval of *any* disparate pricing system is unwarranted.

saying that "no principle of equitable estoppel bars it (the Commission) from the performance of its duty because of mistaken action by its subordinates."

The cause is remanded to the Federal Trade Commission for dismissal of the complaint.

## APPENDIX

## EXCERPTS FROM WARMACK REPORT

\* \* \* \* \* \*

"The purpose of the study and analysis was to develop factual cost evidence in order to determine whether the company's price differentials on sales to merchandising distributors, Alabama Power Company, Consumers Power Company, B. F. Goodrich Company, and Sterchi Brothers Company, represent differentials which make only due allowance for differences in costs of sales or delivery resulting from the differing methods or quantities in which said products are sold or delivered to said customers. The price differentials (discounts) range up to about 3.4% on sales of refrigerators, electric ranges, home freezers, and air conditioners, and up to about 4.4% on sales of laundry equipment including automatic washers and dryers.

"In this engagement our work has been directed principally to an analysis of these differential costs which offer the least resistance to reasonably accurate allocations necessary in establishing factual cost bases for pricing. Such costs usually involve direct selling and they invariably include compensations to individuals, expenses incurred in their duties, and other expenses properly assignable to their efforts—and that was found to be true in the instant studies.

"Most of the other differential costs of sale and delivery are not included in the analysis for the reason that they are not needed to prove savings on which the company bases its price differentials. The differential costs which are not included, of course, have been reviewed and studied to the extent of determining with reasonable certainty that they would have no over-all adverse effect on the cost picture presented in this report. In fact, if included in the analysis, they would serve to increase the cost savings shown herein.

"Merchandising activities for representative geographical trade areas over the country (7 out of the present 19 zones and 40.5% of zone sales) and a representative period of time (6 months) have been covered in the study and analysis for the fiscal year ending September 30, 1959. Three zones, Atlanta, Detroit, and New Orleans, representing about 28% of zones sales were covered for the full fiscal year ending September 30, 1958.

"Most of the differential costs are of a joint nature both as to customers served and as to products sold. Hence it was necessary to develop proper measuring factors on which to base sound separations and allocations of such costs. For this purpose, time studies were conducted over a period of 3 to 4 months of the actual time and effort expended by more than 75 individuals whose compensation and expense represent the principal items of costs covered in this report.

"The results of our study and analysis show that, as compared with regular dealers, cost savings realized per dollar of sales in serving the aforementioned merchandising distributors in 1958 and 1959 were as follows:

|  | "Cost Savings on Sales to Merchandising Distributors | |
|---|---|---|
|  | 1959 | 1958 |
| Alabama Power Company | | |
| New Orleans Zone | 6.44% | 5.68% |
| Consumers Power Company | | |
| Detroit Zone | 7.99% | 3.95% |
| B. F. Goodrich Company | | |
| Three Zones (1958) | 7.02% | |
| Seven Zones (1959) | | 5.94% |
| Sterchi Bros. Company | 7.05% | 6.04% |

"The above cost savings may be compared with the company's price differentials (discounts) to merchandising distributors approximating 3.4% on refrigerators, electric ranges, home freezers, air conditioners, etc., and approximating 4.4% on laundry equipment including washers and dryers.

"For the three zones covered in the studies for 1958, cost savings and the excess of cost savings over discounts allowed on sales to merchandising distributors, by product classifications, are shown in Schedule 3–58 herein. It will be noted in this connection that the cost savings exceed the discounts in every instance. It will be noted also that the excess of cost savings over discounts range from around 1.9% on sales of laundry equipment in the New Orleans Zone up to around 4.6% on sales of refrigerators, freezers, ranges, etc., in the Detroit Zone.

"In this engagement we have endeavored to carry the costing to the refinements customarily required by the Federal Trade Commission in past Robinson-Patman cost cases. Methods and procedures thus employed are spelled out in tabular form herein along with explanatory comments."

\*   \*   \*   \*   \*   \*

"Electric appliances are sold through field offices owned and operated by American Motor Sales Corporation in 19 geographical sales territories over the country designated by the company as 'Zones.' Approximately 86.6% of such sales are to independent retailers, referred to herein as 'regular dealers' and approximately 13.4% are to merchandising distributors during the periods covered herein."

\*   \*   \*   \*   \*   \*

"The price differentials are premised on different methods of merchandising, or at least different requirements in selling under methods of merchandising and hence the resultant cost savings in serving the merchandising distributor customers. These price differentials amount to an average discount of approximately 3.38% on refrigerators, electric ranges, home freezers and air conditioners, and approximately 4.32% on laundry equipment including automatic washers and dryers."

\*   \*   \*   \*   \*   \*

"While sales and deliveries are made directly to the individual outlets of the merchandising distributors the same as to the regular dealers, additional sundry functions performed by the District Managers (salesmen), and to some extent by Zone Managers and Branch Managers, in serving dealers are not required in serving merchandising distributors.

"This may be best illustrated by a brief outline of the work program of the District Managers (salesmen) in contacting dealers at their establishments. The functions of the District Managers include the following:

"(1) Determining the standing and general reputation of the dealer in the community and his demonstrated merchandising ability in the local trade.

"(2) Presentation and demonstration of products, product features and advantages, available and applicable merchandising plans and programs, and the general operating policies and practices of the zone as the "distributor and the American Motors Corporation as the "manufacturer."

"(3) Assisting the dealer in developing sales and merchandising plans applicable to the relative size (sales volume) of the dealership and the economic scale of the area he serves.

"(4) Assisting the dealer in the training of retail salesmen through organized training programs or meetings on specific subjects.

"(5) Soliciting orders for products in quantities and model assortments consistent with dealer's ability to merchandise and within the extent of his financial responsibility and ability to pay.

"(6) Assisting dealer in securing wholesale financing (floor-plans) when necessary, and retail financing (time-payment sales); also periodic

inventory checks on floor-planned products.

"As already stated, many of these functions are not required in serving the merchandising distributors who perform the same or similar services for themselves through their own sales organization. This, of course, accounts largely for the cost savings disclosed by our study and analysis as shown herein."

The territorial extent of Warmack's study was disclosed as follows:

"The data set forth in this report represents the results of studies of costs of merchandising in the company's Atlanta, Cleveland, Dallas, Detroit, New Orleans, Pittsburgh, and Seattle Zones for the six-months' period, March 1, 1959, through August 31, 1959; and for the Atlanta, Detroit, and New Orleans Zones for the full fiscal year ending September 30, 1958.

"In selecting the zones (geographic areas) covered in these studies, particularly the current studies in 1959, it was a primary requisite that the Detroit Zone be included for the reason that it serves Consumers Power Company. The same was true as to the New Orleans Zone which serves Alabama Power Company. Since Sterchi Brothers Company operates in the New Orleans and Atlanta Zones the Atlanta Zone was included. The Cleveland and Pittsburgh Zones were included for the reason that the preliminary investigation of the Federel Trade Commission was centered in those areas. For the purposes of rounding out a reasonable representative cost coverage of the company's merchandising activities, the Dallas and Seattle Zones were also included in the studies.

"*Actual Territories Served* in the 7 zones (geographic areas) include all or most of the states of Alabama, Florida, Georgia, Louisiana, Michigan, Mississippi, Ohio, Oregon, Tennessee, Texas, Virginia, and Washington. In addition it includes 22 counties in western Pennsylvania, 16 in West Virginia, 10 in northern Indiana, 10 in western Idaho, 2 in northern California, and 1 county in western Montana."

\* \* \* \* \* \*

"Cost included in Analysis

"Differential cost information developed and presented in this report principally represents the cost and expense of direct selling in the field, viz., salaries, bonuses, added compensation (commissions) earned under the company's incentive compensation plan, and related expenses. In addition it includes compensation and expense of servicemen, as well as credits and collection expense, bad debt expense, and a part of the office expense (mostly stenographic) in the 7 zones covered in the studies."

\* \* \* \* \* \*

"Other costs Reviewed and Studied

"Other costs of sales and delivery, as previously stated, have been reviewed and studied to the extent of determining with reasonable certainty that they would have no overall adverse effect on the cost picture here presented.

"*Factory Sales Organization* costs and expense of American Motors Corporation is probably the principal item of these other costs. It includes compensation and expenses of Executives including the Vice President in Charge of Sales, General Sales Manager—Appliances, Merchandising Manager, Sales Manager—Commerical Division, Manager—Retail Marketing Division, Manager of Dealer Development, and a number of others including the Manager of National Accounts."

\* \* \* \* \* \*

"Time records have not been kept on the time and effort expended by the officers, officials, and other personnel in the Factory Sales Organization; neither have they been requested to supply estimates of their time expended in promoting retail sales of electric appliances. It would appear, however, from a review of their general activities that this class of expense would run proportionally heavier to the efforts and activities in promoting 'regular dealer' sales than in promoting sales to 'merchandising dis-

tributors.' Hence, if this class of expense were brought into the cost picture it would have the effect of increasing the cost savings shown herein."

Appended to this report were schedules of figures of the data compiled to support the report's conclusions.

BATTISTI, District Judge (dissenting).

While I agree that American Motors adequately demonstrated that the average additional cost of dealing with members of its regular dealer group exceeded the price advantage afforded merchandising distributors,[1] I am unable to agree that the Commission clearly erred in finding that American Motors failed to cost justify its price differential. My view is that the record before us not only supports but requires a finding that American Motors failed to establish that members of its regular dealer group possessed "such selfsameness as to make the averaging of the cost of dealing with the group a valid and reasonable indicium of the cost of dealing with any specific group member." United States v. Borden Company, et al., 370 U.S. 460, 469, 82 S. Ct. 1309, 1314, 8 L.Ed.2d 627 (1962).

The court's opinion recognizes that the wide range in sales volume and style of doing business within the regular dealer group precludes a finding of homogeneity or selfsameness based upon such factors. However, it states that "[t]he needed homogeneity is not dependent upon the size or style of doing business, provided American Motors' method of using them [the regular dealers] to market its products exposed it to the 'selfsameness' and uniformity in its burden of costs." (p. 12) Based upon a view that American Motors adequately demonstrated that as a general practice each of its regular dealers availed themselves of the six additional categories of services, the court seems to conclude that it follows that American Motors has thereby demonstrated

that the providing of these services exposed it to a uniform burden of costs or, in other words, that the *average* cost of providing these additional services to members of the regular dealer group was reasonably equivalent to the *actual* cost of providing the same to the individual members of the group. For such a conclusion to follow, the nature of the services would of necessity have to be such that the cost of providing the same, when expressed in terms of a percentage of sales, would be reasonably uniform as to all regular dealers regardless of their sales volume or other distinguishing characteristics.

Assuming that the record before us demonstrates that as a general practice each of Amercan Motors' regular dealers availed themselves of the six additional categories of services, it must be noted that the record contains not one scintilla of direct evidence, by way of random sample or otherwise, that the cost of providing these services, when expressed in terms of a percentage of sales, was reasonably uniform as to the individual members within the regular dealer group. A finding of such reasonable uniformity, therefore, would of necessity have to be predicated upon those inferences which might reasonably be drawn from the nature of the services themselves and the surrounding circumstances.

Where, as in the instant case, a grouping of customers may not be justified on the basis of similarity in sales volume and style of doing business and an effort is made to justify the same on the basis that additional services were rendered, it seems clear that under *Borden* it must be demonstrated not only that the members of the group received the services but also that the cost of providing the same was reasonably uniform as to all members of the group. The latter element might well be established by a sampling of the cost of providing the services to individual dealers having different sales

---

1. See footnote 7 of majority opinion.

volumes and styles of doing business,[2] and also by testimony on this point from marketing experts. Without such evidence the Commission could only speculate whether the cost of providing the services was reasonably uniform as to all members of the group.

In granting a price concession to certain distributors, American Motors acted entirely in secret and apparently without giving any detailed analysis to the matter of cost justification. Because of the secret nature of the concession, regular dealers were obviously foreclosed from electing whether they should take advantage of the price concession or obtain the additional services.[3] When American Motors was ultimately called upon to cost justify its secret price concession it lumped together all of the regular dealers on a zone-by-zone basis and merely figured the average cost of supplying them with the six additional categories of services.

It would seem an understatement to say that the six categories of additional services are rather nebulous in nature. With regard to a number of the categories, it seems apparent that the cost of providing the same, when expressed in terms of a percentage of sales, would vary greatly in relation to volume of sales and method of doing business. In presenting its case American Motors offered no evidence to negate this position and, as previously noted, in no manner attempted to affirmatively demonstrate that the cost of providing the services would be reasonably uniform as to the individual members within the regular dealer group.

On the evidence submitted I do not think it reasonable to infer from the nature of the six additional services and the surrounding circumstances that the cost of providing such services was reasonably uniform as to the individual regular dealers. Accordingly, I am of the opinion that American Motors has failed to cost justify the price concession granted its merchandising distributors, and that the judgment of the Commission should be affirmed.

2. The majority's concern that the view taken by the Commission would require a cost analysis as to each and every dealer appears to me to be unwarranted.

3. A similar situation prevailed in the *Borden* case. With regard to the same, the Supreme Court stated in Footnote 13:

"Another suspect feature is that classifications based on services received by independents were apparently frozen—making it impossible for them to obtain larger discounts by electing not to receive the cost-determinative services—with no justifiable business reason offered in support of the practice." (370 U.S. 460, 471, 82 S.Ct. 1309, 1315.)