**Robert J. SWETTLEN and Patricia A. Swettlen**

**v.**

**WAGONER GAS AND OIL, INC., et al.**

**Civ. A. No. 72-111.**

United States District Court,
W. D. Pennsylvania.

April 1, 1974.

See also D.C., 369 F.Supp. 893.

Daniel J. Beggy, Mansmann, Beggy, Steele, & Campbell, Pittsburgh, Pa., for plaintiff.

Edmund K. Trent, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant Wagoner Gas and Oil, Inc.

Dale Hershey, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

The parties to this proceeding, on the basis of a Stipulation of Facts, have asked this Court to rule on the legality of the pricing system used by Wagoner Gas and Oil, Inc. and allegedly concurred in by Phillips Petroleum Company. This pricing system forms the basis of the civil anti-trust suit before the Court.

The Plaintiffs (Swettlen) were operators of a gasoline station in the Borough of Youngwood, Westmoreland County, Pennsylvania, between September 1, 1969 and April 30, 1972. They brought suit against Wagoner Gas and Oil, Inc. (Wagoner), the tenant of the service station premises and a jobber or distributor to Swettlen of the petroleum products sold to the public; and against Phillips Petroleum Company (Phillips), supplier of the products to the jobber; and against George H. Wagoner, owner and lessor of the service station real estate and operator of the distribution business prior to 1965, when Wagoner Gas and Oil, Inc. was incorporated. The Plaintiffs contend, and the Defendants deny, that the pricing system used by Wagoner violated Section 1 of the Sherman Act. The parties entered into written stipulations describing the system of pricing.

Prior to 1962, George Wagoner was a jobber for various oil companies. In 1962, he entered into a jobber contract with Phillips for a territory which included Westmoreland County, parts of Allegheny and Washington Counties, all in Pennsylvania, and a part of Garrett County, Maryland. Within this territory, George Wagoner owned or leased service stations for the retail sale and distribution of petroleum products. He leased or sub-let the stations to independent retail dealers and supplied them with petroleum products. In 1965, George Wagoner incorporated his business and formed Wagoner Gas and Oil, Inc. He was an officer, director, and shareholder of the corporation, and in 1965, Wagoner entered into the subject jobber contract with Phillips, which was the same contract which George Wagoner individually had signed in 1962.

Wagoner used a unique pricing system in charging the Plaintiffs and its other dealers. It determined what the "normal" retail price should have been for the various grades of gasoline and diesel fuel it delivered. A pricing schedule was then devised in which the "normal" price appeared as the highest figure on the schedule. The schedule then listed possible retail prices below the "normal" price, and for each price, the schedule

listed a corresponding cost to the dealer. When a dealer's retail price was below the "normal" retail price, then the dealer's price per gallon would vary according to the amount his retail price was below "normal".

The system is demonstrated from the following examples:

WAGONER'S EFFECTIVE PRICES TO DEALERS (REGULAR GASOLINE) (¢ per gal.)

| Price Period | Dealer Retail | Effective Price to Dealer |
|---|---|---|
| I | | |
| Prior to | 35.9¢ | 32.12¢ |
| 9/1/69— | 31.9 | 29.12 |
| 3/30/70 | 28.9 | 26.90 |
| II | 36.9¢ | 33.01¢ |
| 3/31/70 | 31.9 | 29.26 |
| | 29.9 | 27.90 |
| III | 37.9¢ | 34.01¢ |
| 4/1/70— | 31.9 | 29.51 |
| 11/16/70 | 30.9 | 28.09 |
| IV | 38.9¢ | 34.9¢ |
| after | 31.9 | 29.65 |
| 4/30/72 | 30.9 | 28.9 |

WAGONER'S EFFECTIVE PRICES TO DEALERS (PREMIUM GASOLINE) (¢ per gal.)

| Price Period | Dealer Retail | Effective Price to Dealer |
|---|---|---|
| I | | |
| Prior to | 40.9¢ | 36.87¢ |
| 9/1/69— | 36.9 | 33.87 |
| 3/30/70 | 34.9 | 32.15 |
| II | 40.9¢ | 37.01¢ |
| 3/31/70 | 36.9 | 34.01 |
| III | 41.9¢ | 38.01¢ |
| 4/1/70— | 36.9 | 34.26 |
| 11/16/70 | 35.9 | 33.15 |
| IV | 42.9¢ | 38.9¢ |
| 11/17/70— | | |
| after | 39.9 | 36.65 |
| 4/30/72 | 37.9 | 35.15 |

WAGONER'S EFFECTIVE PRICES TO DEALERS (DIESEL FUEL) (cents per gal.)

| Price Period | Dealer Retail | | Effective Price to Dealer |
|---|---|---|---|
| | Incl. Tax | W/o Tax | |
| I, II | | | |
| Prior to | 35.9¢ | 23.9¢ | 21.15¢ |
| 9/1/69— | | | |
| 3/31/70 | 31.9 | 19.9 | 18.4 |
| III, IV | | | |
| 4/1/70— | 36.9¢ | 23.9¢ | 21.15¢ |
| 11/17/70– | | | |
| after | | | |
| 4/30/72 | 32.9 | 19.9 | 18.4 |

Before a dealer could reduce a price, Wagoner first would determine whether the dealer's competitive conditions warranted a reduction in price, and if Wagoner agreed to a reduction, it would then reduce its price on the next shipment to the dealer by the amount established by the schedule. If a dealer's retail price was below "normal", and he sought a price increase to a price level that was still below "normal", Wagoner's price would automatically increase according to the schedule. For example, in the case of gasoline, the schedule was so set forth that if the retail price was increased 1¢ per gallon, then the dealer received one quarter of a cent and Wagoner received three quarters of the cent.

Wagoner sold the Plaintiffs diesel fuel and *two* grades of gasoline. Regular gasoline was sold at retail as "Phillips 66" and premium gasoline was sold as "Flite Fuel". In addition, Wagoner installed pumps at the rear of the station which dispensed so-called "commercial regular". Commercial gasoline was *exactly* the same as "Phillips 66" except that the retail price was at least 2¢ a gallon less. There was also available at retail "commercial premium" which was the same product as "Flite Fuel", but the retail price was at least 2¢ per gallon less than "Flite Fuel". Wagoner also installed blending pumps which contained "Phillips 66"; these pumps had mixtures which called for 25%, 50% and 75% of "Flite Fuel". The features of Wagoner's pricing system which the Plaintiffs challenge were equally applicable to all of the products, but for simplicity we will only describe these features in detail as they related to the regular gasoline, known as "Phillips 66", and sold at the so-called regular prices.

At the time when the Plaintiffs began to operate the service station in September of 1969, Wagoner's price to its dealers in Pennsylvania was 32.12¢ per gallon. If, however, a dealer was required by competitive conditions to reduce his posted retail price to the public below 35.9¢ per gallon (the "normal" price

during Period I), then Wagoner would, on its next shipment of gasoline, reduce its price to the dealer by three quarters of a cent for every cent the dealer reduced his price below 35.9¢ until the dealer's price reached 28.9¢, at which point Wagoner's price would be 26.9¢. For each cent of retail price reduction below 28.9¢, Wagoner reduced its price to the dealer in a like amount—i. e., 1¢. The result of this program was that for the first seven cents of retail price reduction, Wagoner stood three quarters of the loss and the dealer one quarter, and for further reductions, Wagoner stood all the loss and the dealer none. The dealer was thus guaranteed a profit of at least 2¢ per gallon.

When competitive conditions permitted the dealer to increase his prices, Wagoner withdrew as much of the price support as was necessary, so that for each cent that the dealer raised his retail price to the public, Wagoner increased its price three quarters of a cent on its next shipment of gasoline to the dealer. If the dealer raised his retail price above 35.9¢, the "normal" retail price during Period I, Wagoner would not increase its price to him above 32.-12¢, the corresponding "normal" dealer cost during Period I, but at no time during the period did the Plaintiff or any other of the Wagoner Dealers ever sell their gasoline or diesel fuel at a price that was above the "normal" price.

When the retail price fell and when it rose, Wagoner's corresponding price change to the dealer did not affect the gasoline already in the dealer's possession, but was only applicable to the next shipment delivered. The dealer was at all times free to set his posted retail prices at whatever level he chose, and to raise or lower them in accordance with what he believed to be the most profitable price for him. But, Wagoner reserved the right to decide whether it believed competitive conditions were such that the price support at any particular level was needed by the dealer. In other

words, if the dealer wished to reduce his price below the competitive level, Wagoner was not obliged under its agreement to give any price support. The stated purpose for this pricing system as set forth in the argument presented by Wagoner's counsel, was to assist its dealers in defending against a price war begun by competitors, but not to enable one of its dealers to start a price war himself. It should be noted, however, that this purpose is not set forth at any place in the agreement itself.

When the Plaintiffs took over the service station in Youngwood from the previous owner, the retail price of "Phillips 66" was 31.9¢,[1] so that from the beginning they received price support from Wagoner by a reduction of 3¢ per gallon, from 32.12¢ to 29.12¢. During the two years and eight months that the Plaintiffs were in business, retail prices changed ten times, varying between a low of 31.9¢ at the beginning of that period to a high of 35.9¢ at the latter part of 1971, and 32.9¢ at the end of the period. Wagoner's price to the Plaintiffs ranged thus from 29.12¢ at the beginning, to 32.65¢ at the high and to 30.4¢ at the close. As indicated previously, at no time during the period did the Plaintiffs or any other of Wagoner's Dealers, ever sell their gasoline or diesel fuel at a price which was above what Wagoner pegged as "normal".

The question this Court must decide then is: Whether or not this pricing system is violative of Section 1 of the Sherman Act?

Section 1 of the Sherman Act (15 U. S.C. § 1) provides in part: "Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

In the situation as described above we must start with the landmark decision of United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), which held that under the

1. Stipulation of Facts No. 1, Schedule 1.

Sherman Act, agreements for price maintenance of articles in interstate commerce are unreasonable restraints. Thus, the Court held as follows (310 U. S. at p. 218, 60 S.Ct. at p. 842, 84 L.Ed. at p. 1165):

"Agreements for price maintenance of articles moving in interstate commerce are, without more, unreasonable restraints within the meaning of the Sherman Act because they eliminate competition, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and agreements which create potential power for such price maintenance exhibited by its actual exertion for that purpose are in themselves unlawful restraints within the meaning of the Sherman Act.

\*  \*  \*  \*  \*  \*

The reasonableness of prices has no constancy due to the dynamic quality of business facts underlying price structures. Those who fixed reasonable prices today would perpetuate unreasonable prices tomorrow, since those prices would not be subject to continuous administrative supervision and readjustment in light of changed conditions. Those who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system. But the thrust of the rule is deeper and reaches more than monopoly power. Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered or stabilized prices they would be directly interfering with the free play market forces. The Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. Congress has not left with us the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies. It has no more allowed genuine or fancied competitive abuses as a legal justification for such schemes than it has the good intentions of the members of the combination. If such a shift is to be made, it must be done by the Congress. Certainly Congress has not left us with any such choice. Nor has the Act created or authorized the creation of any special exception in favor of the oil industry. Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike. There was accordingly no error in the refusal to charge that in order to convict the jury must find that the resultant prices were raised and maintained at 'high, arbitrary and noncompetitive levels.' The charge in the indictment to that effect was surplusage.

Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing as used in the Trenton Potteries Co. Case has no such limited meaning. An agreement to pay or charge rigid, uniform prices would be an illegal agreement under the Sherman Act. But so would agreements to raise or lower prices whatever machinery for price-fixing was used. That price-fixing includes more than the mere establishment of uniform prices is clearly evident from the Trenton Potteries Co. Case itself, where this Court noted with approval Swift & Co. vs. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, in which a decree was affirmed which restrained a combination from 'raising or lowering prices or fixing uniform prices' at which meats will be sold. Hence, prices are fixed within the meaning of the Trention Potteries Co. Case if the range

within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon. And the fact that, as here, they are fixed at the fair going market price is immaterial. For purchases at or under the market are one species of price fixing. . . .

\* \* \* \* \* \*

Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se. . . ."

The *Socony-Vacuum* case involved a scheme which as set forth in the indictment charged twenty-seven corporations and fifty-six individuals with violations of Section 1 of the Sherman Act. The indictment charged that the defendants (1) "combined and conspired together for the purpose of artificially raising and fixing the tank car prices of gasoline" in the "spot markets" in the East Texas and Mid-Continent fields; (2) "have artificially raised and fixed said spot market tank car prices of gasoline and have maintained said prices at artificially high and noncompetitive levels, and at levels agreed upon among them and have thereby intentionally increased and fixed the tank car prices of gasoline contracted to be sold and sold in interstate commerce as aforesaid in the Mid-Western area; (3) "have arbitrarily," by reason of the provisions of the prevailing form of jobber contracts which made the price to the jobber dependent on the average spot market price, "exacted large sums of money from thousands of jobbers with whom they have had such contracts in said Mid-Western area;" and (4) "in turn have intentionally raised the general level of retail prices prevailing in said Mid-Western area."

In the instant case, there is not a price support system as detailed above. The parties here have agreed in Paragraph 62 of the Stipulation, that the effect of the pricing system was that if the dealer's retail price was lowered, *and Wagoner determined that the lowering of the retail price of the dealer was warranted by the dealer's competitive conditions*, then Wagoner's price of its *next* shipment to the dealer was lowered according to the formula described. If the dealer's retail price was raised to a price not higher than the "normal" retail price then in effect, then Wagoner's price of its next shipment to the dealer was raised according to the prices as described. If the dealer set his retail price for gasoline above the highest retail price set forth as "normal", Wagoner did not increase its price to the dealer above the highest effective price to the dealer in the schedule.

In the recent case of Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945 (S.D.Texas 1972), which was a private anti-trust action for treble damages and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), District Judge Carl Bue, Jr. very clearly and carefully analyzed the problem in the context in which we are here involved, in the following language (at p. 950):

". . . While the purpose of the Sherman Act, and section 1, as aptly expressed in its title, is 'to protect trade and commerce against unlawful restraints and monopolies', 26 Stat. 209, the dominant theme of the law is readily apparent—the protection and preservation of competition. The intended implementation of this purpose can be seen by examining the statutory framework of the Act. Section 1 of the Act is aimed at certain 'means' to restrain trade or commerce. Accordingly, that section is set in a framework which forbids unduly restraining trade or commerce by means of contracts, combinations and conspiracy. Section 2 of the Act is aimed at the '*ends*' or results of cer-

tain practices, rather than the form of the *means* employed. It, therefore, outlaws attempts to monopolize and actual monopolization of trade or commerce. See Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911)." (Emphasis supplied).

The principal question we must decide is: Whether or not the Defendant's conduct constitutes price fixing in purpose or effect? In a simple price fixing case the answer is clear, but frequently the character or effect of the conduct is equivocal and a broader view of the functioning of the market is required before the Court can decide whether the given behavior, in fact, amounts to price fixing. An important decision in this regard is Sun Oil Company v. F.T.C., 294 F.2d 465 (5th Cir. 1961) reversed on other grounds 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). In the Sun Oil Company case, the Federal Trade Commission held (55 F.T.C. 955) that defendant Sun Oil Company, a gasoline supplier, could not assert a Section 2(b) defense that it was simply meeting competition when charged with price discrimination violative of Section 2(a) of the Robinson-Patman Price Discrimination Act. Sun had entered into a price fixing agreement with McLean, a gasoline retailer. McLean had repeatedly requested Sun to reduce its tank wagon price to him to a level which would permit his gasoline to compete price-wise with Super Test, a competing retailer located across the street. In order to meet the price of Super Test, McLean needed to reduce his price by 3¢ per gallon. Sun granted McLean a "private" discount of 1.7¢ per gallon and McLean thereupon reduced his price by 3¢ per gallon. The Fifth Circuit Court of Appeals reversed the Commission on the basis that there was insubstantial evidence in the record to support the Federal Trade Commission's finding of price fixing. The Court stated as follows (294 F.2d at p. 473):

"To our way of thinking, the court's approach in Enterprise, and the Commission's doctrinaire approach here are inconsistent with the view of gasoline marketing taken in the 'Detroit' opinion, Standard Oil Company v. Federal Trade Commission, 1951, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239. Standard Oil of Indiana, to meet a competitor's price, sold gasoline to four wholesalers, jobbers, in the Detroit area at a lower price than it charged its retail dealers. The jobbers passed on this saving to their customers who were able to undercut retail dealers buying directly from Standard Oil. The Commission took the position that Section 2(b) merely allowed rebuttal of a prima facie case, and was not a substantive justification of an otherwise unlawful price discrimination. The Supreme Court held that Section 2(b) good faith defense was absolute even though a substantial lessening of competition might result, and remanded the case to allow Standard 'to show that its lower price to each jobber was made in order to retain that jobber as a customer and in good faith to meet an equally low price offered by one or more [of its] competitors.' 340 U.S. 231, 236, 71 S.Ct. 240, 243, 95 L.Ed. 239. The case is distinguishable on the facts, but the Court was acutely aware of the interaction of competition at various levels and recognized the validity of the defense even though the price differential would have an injurious effect on competition among the supplier's dealers and the dealer's purchasers:

'It must have been obvious to Congress that any price reduction to any dealer may always affect competition at that dealer's level as well as at the dealer's resale level, whether or not the reduction to the dealer is discriminatory. Likewise, it must have been obvious to Congress that any price reductions initiated by a seller's competitor would, if not met by the seller, affect competition at the beneficiary's level or among the beneficiary's cus-

tomers just as much as if those reductions have been met by the seller.' 340 U.S. 231, 250, 71 S.Ct. 240, 250, 95 L.Ed. 239.

The 'actual core of the defense,' the Supreme Court stated, 'still consists of the provision that whenever a lawful lower price of a competitor threatens to deprive a seller of a customer, the seller, to retain that customer, may in good faith meet that lower price.' 340 U.S. 231, 242, 71 S.Ct. 240, 245. Here, there is no doubt that Super Test's prices threatened 'to deprive' Sun of McLean as a customer. They did in fact deprive Sun of McLean as a customer. And they deprived Sun of sales, through McLean, to the motoring public. 'Clearly, a seller's need· for a lower price in response to a decrease in his sales is the same whether the decrease occurs because his purchasers switch to a price cutting competitor or because [his purchasers] are unable to protect their share of the retail market from distributors of a rival product.' "

It is necessary to note that both the economic intent and motive of Sun in granting the discount to McLean were very carefully analyzed from the standpoint that if Sun had not been sure that the market place would force McLean to lower its price in response to the discount of Sun, the arrangement would have been illegal as it would have given him an unjustifiable preference over other Sun Dealers. The Court then concluded that Sun gave the discount to McLean because it was aware of the existing competitive factors in the market place and cognizant that McLean had to reduce its price to consumers in order to meet the competitive requirements of the market.

However, there is another very important part of the Sun Oil Company case which appears as follows (371 U.S. 524, 83 S.Ct. 369, 9 L.Ed.2d 466, 481) ;

"Respondent Sun makes several other arguments ·in support of its position. First, it asserts that the interpretation of § 2(b) urged here by the Commission completely ignores the competitive realities of the gasoline vending business. In essence, Sun argues that, practically viewed, Super Test was not merely a competitor of McLean, but also a competitor of Sun. Oil companies, whether major or minor, integrated or· nonintegrated, it is asserted, compete not at the wholesale or jobber level, but also exclusively at the retail level. All competition, Sun says, is directed to sales of the final product—gasoline—to the motoring consumer, and anything that threatens to reduce the sales of a branded gasoline at the retailer's pump is a threat to the supplier whose business is a direct function of its stations' marketing success or failure. It is contended that the individual station is but a 'conduit' for the supplier and that Sun is thus in competition with Super Test, considered even only as a retailer.

In a very real sense, however, every retailer is but a 'conduit' for the goods which it sells and every supplier could, in the same sense, be considered a competitor of retailers selling competing goods. We are sure Congress had no such broad conception of competition in mind when it established the § 2(b) defense and, certainly, it intended no special exception for the petroleum industry. It is difficult to perceive convincing reasons rationally confining the thrust of respondent's argument to an area narrow enough to preclude effective emasculation of the prohibitions on discrimination contained in § 2(a). Only differences of degree distinguish the situation of the gasoline station operator from that of many other retail outlets, and in numerous instances the distinction, if any, is slight. The 'conduit' theory contains no inherent limitations and its acceptance would so expand the § 2(b) defense as to effect a return to the broader 'meeting competition' provision of the Clayton Act, which the

Robinson-Patman Act amendments superseded.

Sun also argues that the effect of a decision holding the § 2(b) defense unavailable to it in these circumstances will be to prolong and aggravate the destructive price wars which periodically reoccur in the marketing of gasoline. Whether relevant or not, this contention is best put wholly to one side. Such price warfare appears to be caused by a number of basic factors, not the least of which are industry over-capacity and the propensity of some major refiners to engage in so-called 'dual marketing' under which, in order to increase their overall sales and utilize idle facilities, they not only sell branded gasoline to their own dealers but also sell unbranded gasoline to independent retailers or jobbers, often at a lower price. See S.Rep.No.2810, 84th Cong., 2d Sess. 16–19. Whatever we do here can neither eliminate nor mitigate the major economic forces which are productive of these price wars. Moreover, it is wholly unclear whether allowance of the price discrimination prolongs or shortens the war's duration. (It might be noted that the war was not narrowly contained by Sun's actions here.) There are logical arguments on both sides of the question and none are wholly persuasive. Extensive discussion of the various reasoning would serve no useful purpose. As one study concludes after canvassing the contentions: 'one simply cannot be certain.' De Chazeau and Kahn, Integration and Competition in the Petroleum Industry (1959), 481; and see generally, id., pp. 477–483; S. Rep. No. 2810, 84th Cong., 2d Sess. 19–23.

Respondent urges that the interpretation of § 2(b) which we have adopted unfairly forces its small retailer, McLean, to bear alone what to him is the economically insufferable burden of the entire retail price reduction. This, however, erroneously poses the choice as merely two-fold—aid to the retailer by an unlawfully discriminatory price reduction, or no aid at all —and misconceives the availability of other alternatives.

Preliminarily, it must be recognized that we are not dealing here with the situation in which one supplier reduces its prices and another supplier thereupon reduces its prices to prevent its customer from shifting his business to the competing supplier; this is the more normal circumstance and the § 2(b) defense is usually available.

Even in the limited situation with which we here deal—in which the competing retailer cuts his price without his supplier's aid—Sun, as a wholesaler, may reduce its price uniformly and nondiscriminatorily to competing purchasers from it so as to preclude the probable incidence of the substantial anticompetitive effect upon which violation of § 2(a) is here grounded. Sun recognizes, as it must, that it has this choice, but argues that in order to eliminate the possibility of having even a broad price cut deemed illegal under § 2(a), it would of necessity have to extend the benefits of the concessions to all of its dealers in an unwarrantedly wide geographic area, perhaps nationwide. This, it asserts, is required because whatever line it seeks to draw, there will inevitably be some dealer who because of geographic proximity will be deemed to have been illegally discriminated against. The mere existence of a competitive continuum, however, does not require that market limits be indefinitely extended with absurd results in the form of unwarranted nationwide or otherwise overly broad measures of competitive impact. In appraising the effects of any price cut or the corresponding response to it, both the Federal Trade Commission and the courts must make realistic appraisals of relevant competitive facts. Invocation of mechanical word formulas cannot be made to substitute for adequate probative analysis. In cases in which the

economic facts so indicate, carefully drawn area submarkets may be the proper measure of competitive impact among purchasers."

There are other cases which aid in formulating a rule for determining the circumstances existing in vertical relationships which constitute a violation of Section 1 of the Sherman Act. Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319 (2nd Cir. 1969), cert. denied 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777. The Checker case involved a rebate plan under which the purchaser of a taxi cab from a Chrysler Dealer was entitled to receive an automatic cash rebate from Chrysler. This was held not violative of the Sherman Act because the Chrysler Dealers were free to sell at their own prices and the manufacturer's rebate plan was in the nature of an advertising expedient. It was stressed throughout the opinion that for the discount price to be valid there must be the pricing independence of the individual dealer. It is obvious that as long as the agreements or conduct did not restrict the pricing independence of the competitor for resale, there was no illegal price fixing "contract, combination or conspiracy." See also Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 74 Harvard L.R. 655, 705–706 (1962), and Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). In the Albrecht case the Court held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the "mere announcement of his policy and the simple refusal to deal . . ." (88 S.Ct. at 871).

Thus, we must determine in a vertical situation whether there is cooperation or understanding as reflected from the agreement, as well as coercion on the part of the manufacturer. The crux of the matter is whether or not the retailer is free to make his own independent pricing determinations and whether the conduct is characterized as a contract, combination or conspiracy. In the instant case, the contract is clear and, therefore, we must determine if the retailer was free to make his own independent pricing determination.

The case of Sun Oil v. Vickers Refining Co., 414 F.2d 383 (8th Cir. 1969) we believe is decisive of the instant situation. In that case Sunray, a former subsidiary of Sun which had merged into its parent, agreed to supply gasoline to Vickers. Under the contract in that case, Sunray would receive from Vickers the latter's average realization from its jobbers less one and one half cent minimum margin on every gallon of regular grade gasoline, and two and one half cents on premium gasoline. One section of the contract specified that Vickers' prices should be no lower than the prices of one or more of its principle competitors, and that if Vickers acquired a customer on a different basis, Sunray would have the option of excluding Vickers' prices to such customer in computing Vickers' average realization per gallon. The Court of Appeals determined that there was no proof that the agreement in effect "actually did fix prices". The Court then stated as follows (at pp. 389–390):

"Finally, Sunray contends that, even as interpreted by the trial court, the contract embodies an arrangement to maintain and stabilize prices in violation of the Sherman Act. Sunray asserts that the disputed provision was designed to restrict, restrain, and dampen price competition.

Stabilization of prices is within the ban of § 1 of the Sherman Act. United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). In order to bring this contract within the ban, however, Sunray is required to demonstrate that the agreement had the effect of stabilizing prices in some degree. United States v. Container Corp. of America, *supra*. Sun-

ray has produced no such evidence but would rely on statements made in Vickers' pre-trial pleadings to the effect that, in entering into the contract with Sunray, Vickers intended to continue its existing pricing policies. The record, however, supports the trial court's finding that the parties did not intend the disputed clause to be a price-fixing agreement and that the operation of the contract did not affect Vickers' resale prices in any manner.

As the Supreme Court stated in United States v. Socony-Vacuum Oil Co., *supra*: 'Under the Sherman Act a combination formed for the *purpose and with the effect* of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.' (Emphasis added.) 310 U.S. at 223, 60 S.Ct. at 844. It is difficult to see how the parties can be held to have entered into a price-fixing agreement in the absence of intent to fix prices or proof that the agreement actually did fix prices. See, Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5th Cir. 1962); United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y. 1960).

We also note that the Supreme Court has taken a dim view of private parties seeking to avoid their contractual obligations by asserting the illegality of the contract under the Sherman Act. The Court said in Kelly v. Kosuga, 358 U.S. 516, 519, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959): '[T]he federal courts should not be quick to create a policy of nonenforcement of contracts beyond that which is clearly the requirement of the Sherman Act.' Accordingly, the trial court's consideration of all the relevant evidence in interpreting the contract was proper. Its conclusion that the contract does not violate the Sherman Act is supported by substantial evidence." (Emphasis supplied).

An analysis of the instant situation indicates that the agreement in and of itself does not constitute a control by the wholesaler of the price at which the retailer was to operate. Thus, it would not be sufficient in this case for the Plaintiffs to prove the agreement as shown by the Stipulations. The only way the Plaintiffs in this case can show a violation of the Sherman Act will be to prove to the jury that the *effect* of the agreement was in essence the control of the price at the pump. To sustain their case, the Plaintiffs must offer such proof that the purpose and the effect of the Defendants' pricing system was the raising, depressing, fixing, pegging, or stabilizing of the price of the commodity. It is difficult to see how the Plaintiffs can prove that the agreement alone did fix prices but that will remain for trial.

An appropriate order will be entered.